¶ 1.
REBECCA GRASSL BRADLEY, J.
In creating an executive branch entity with authority to pass judgment and impose discipline on a judge's exercise of core judicial powers, the Wisconsin legislature violates the Wisconsin Constitution's structural separation of powers and invades a domain recognized for over two hundred years as the exclusive province of the judiciary. Neither the executive branch nor the legislature *152 may reprimand or otherwise discipline a Wisconsin judge. The Wisconsin Constitution reserves such disciplinary powers for the supreme court alone. Nor may the legislature empower the executive branch to threaten any judicial officer with repercussions for exercising constitutional power vested exclusively in the judiciary.
¶ 2. Encroachment on judicial power degrades the judicial independence that serves as a bulwark protecting the people against tyranny. By statutorily authorizing executive action against the judiciary, the legislature unconstitutionally conferred power on an executive board to impair, improperly influence, and regulate the judiciary's exercise of its constitutional duties. Specifically, the legislature transgressed the constitutional boundaries of its powers by authorizing the Crime Victims Rights Board (the Board) to investigate and adjudicate complaints against judges, issue reprimands against judges, and seek equitable relief and forfeitures through civil actions against judges. We therefore affirm the decision of the circuit court and hold that Wis. Stat. §§ 950.09(2)(a), (2)(c)-(d) and (3) and 950.11 (2015-16)[1] are unconstitutional with respect to judges; accordingly, the Board's actions against Judge William M. Gabler are void.
I. AN INDEPENDENT JUDICIARY
¶ 3. Any student of American government can recite the fundamental principle that both our state and the federal Republic separate governmental powers between independent legislative, executive, and judicial branches. In a 1796 speech to his colleagues in *153 the Fourth Congress, then-Representative James Madison deftly summarized the dispersal of power he helped to engineer:
The powers given up by the people for the purposes of Government, had been divided into two great classes. One of these formed the State Governments; the other, the Federal Government. The powers of the Government had been further divided into three great departments; and the Legislative department again subdivided into two independent branches. Around each of these portions of power were seen also exceptions and qualifications, as additional guards against the abuses to which power is liable.
5 Annals of Cong. 493 (1796). Joseph Story later "deemed [it] a maxim of vital importance" that "the three great powers of government. . . should for ever be kept separate and distinct." 2 Joseph Story, Commentaries on the Constitution of the United States § 519, at 2-3 (Boston, Hilliard, Gray, & Co., 1833). After more than two hundred years of constitutional governance, that tripartite separation of independent governmental power remains the bedrock of the structure by which we secure liberty in both Wisconsin and the United States.
¶ 4. To the Framers of the United States Constitution, the concentration of governmental power presented an extraordinary threat to individual liberty: "The accumulation of all powers, legislative, executive, and judiciary, in the same hands, whether of one, a few, or many,. . . may justly be pronounced the very definition of tyranny." The Federalist No. 47, at 298 (James Madison) (Clinton Rossiter ed., 1961) [hereinafter Federalist]. As Madison explained when advocating for the Constitution's adoption, neither the legislature nor the executive nor the judiciary "ought *154 to possess, directly or indirectly, an overruling influence over the others in the administration of their respective powers." Federalist No. 48, id. at 305 (James Madison).
¶ 5. The Framers' fear of concentrated power reflected the thinking of seventeenth and eighteenth century political philosophers, who warned of the ramifications of unchecked governmental power. John Locke, for example, observed that "it may be too great a temptation to human frailty, apt to grasp at power, for the same persons who have the power of making laws to have also in their hands the power to execute them." John Locke, The Second Treatise of Civil Government § 143 (1764), reprinted in Two Treatises of Government 119, 194 (Thomas I. Cook ed., 1947). Absent separation, those who make the laws "may exempt themselves from obedience," or they might "suit the law, both in its making and execution, to their own private advantage." Id. Montesquieu[2] shared Locke's concern about the threat to liberty from accumulated power, expressing apprehension that a government with shared legislative and executive power could first "enact tyrannical laws" then "execute them in a tyrannical manner." 1 Montesquieu, The Spirit of the Laws 151-52 (Oskar Piest et al. eds., Thomas Nugent trans., 1949) (1748). Similar concern marked Montesquieu's assessment of the judicial power, which could impinge on liberty through "arbitrary control," if fused with the legislature, or by "violence and oppression," if mixed with the executive. Id. at 152.[3]
*155 1 6. "[T]he Constitution of the United States divides all power conferred upon the Federal Government into 'legislative Powers,' Art. I, § 1, '[t]he executive Power,' Art. II, § 1, and '[t]he judicial Power,' Art. III, § 1. . . ." Lujan v. Defenders of Wildlife, 504 U.S. 555, 559 (1992) (second and third alterations in original). Unlike some state constitutions, however, the federal Constitution does not include a clause expressly adopting the separation of powers. Instead, because "[t]he Constitution enumerates and separates the powers of the three branches of Government in Articles I, II, and III,... it is this 'very structure' of the Constitution that exemplifies the concept of separation of powers." Miller v. French, 530 U.S. 327, 341 (2000) (quoting INS v. Chadha, 462 U.S. 919, 946 (1983)); see also Humphrey's Ex'r v. United States, 295 U.S. 602, 629-30 (1935) ("So much is implied in the very fact of the separation the powers of these departments by the Constitution . . . .").[4]
¶ 7. The Constitution's structure advances separation through deliberate calibration of incentives and control between the branches. To attain a lasting separation, the Framers did not place their trust in mere "parchment barriers against the encroaching spirit of power." Federalist No. 48, supra, at 305. Rather, they "built into the tripartite Federal Government ... a self-executing safeguard against the en *156 croachment or aggrandizement of one branch at the expense of the other." Clinton v. Jones, 520 U.S. 681, 699 (1997) (alteration in original) (quoting Buckley v. Valeo, 424 U.S. 1, 122 (1976)).[5] Specifically, the Constitution gives "to those who administer each department the necessary constitutional means and personal motives to resist encroachments of the others," therefore guaranteeing "security against a gradual concentration of the several powers in the same department." Federalist No. 51, supra, at 318-19 (James Madison).[6]
f 8. When structuring the federal judiciary, the Framers knew from experience the perils of adopting a separation of powers in name without paying appropriate attention to the incentives affecting individual judges. By the time of the Constitutional Convention, "[t]he Framers of our Constitution lived among the *157 ruins of a system of intermingled legislative and judicial powers, which had been prevalent in the colonies long before the Revolution." Plaut v. Spendthrift Farm, Inc., 514 U.S. 211, 219 (1995). Several colonial legislative bodies not only reviewed judicial decisions but also "correct[ed] the judicial process through special bills or other enacted legislation." Id.[7] Some early state legislatures — Virginia, for example — possessed and employed substantial control over judicial salaries and tenure, rivaling the British government's absolute authority that helped spark the Revolution. Federalist No. 48, supra, at 307-08 (citing Thomas Jefferson, Notes on the State of Virginia (1781)); see also The Declaration of Independence (U.S. 1776) ("[The King of Great Britain] has made Judges dependent on his Will alone, for the tenure of their offices, and the amount and payment of their salaries.").
¶ 9. As a reaction to the Framers' experiences with compromised judicial independence, Article III of the federal Constitution "protects liberty" and "implement[s] the separation of powers" in part "by specifying the defining characteristics of Article III judges." Stern v. Marshall, 564 U.S. 462, 483 (2011). Article III provides that federal judges "shall hold their Offices during good Behaviour" and, "at stated Times, receive . .. Compensation, which shall not be diminished during their Continuance in Office." U.S. Const, art. III, § 1. Both provisions evince a recognition that "a power over a man's subsistence amounts to a power over his will." Federalist No. 79, supra, at 471 (Alexander Hamilton) (emphasis omitted); see United States v. Hatter, 532 U.S. 557, 568 (2001) (observing that the *158 Constitution "help[s] to secure an independence of mind and spirit necessary if judges are 'to maintain that nice adjustment between individual rights and governmental powers which constitutes political liberty'" (quoting Woodrow Wilson, Constitutional Government in the United States 143 (1911))); United States v. Will, 449 U.S. 200, 218 (1980); cf. Bradley v. Fisher, 80 U.S. (13 Wall.) 335, 347 (1872) ("[I]t is a general principle of the highest importance to the proper administration of justice that a judicial officer, in exercising the authority vested in him, shall be free to act upon his own convictions, without apprehension of personal consequences to himself."). By insulating individual federal judges from manipulation by Congress or the Executive, the Framers assured that the Judiciary as a whole could exercise genuinely independent judgment.
f 10. Over time, the Supreme Court has both defended the independence of judges and protected the judicial power from encroachment. Thus, the Court has held that even marginal changes in judicial salaries violate the constitutional prohibition on diminishment of compensation. See Hatter, 532 U.S. at 578 (imposition of Social Security taxes on sitting judges); Will, 449 U.S. at 230 (revocation of scheduled pay increase). The Court has also held that the other branches may not "confer the Government's 'judicial Power' on entities outside Article III." Stern, 564 U.S. at 484. Accordingly, "Congress cannot vest review of the decisions of Article III courts in officials of the Executive Branch." Plaut, 514 U.S. at 218 (citing Hayburn's Case, 2 U.S. (2 Dall.) 409 (1792)). Neither may Congress "prescribe rules of decision to the Judicial Department of the government in cases pending before it." Id. (internal quotation mark omitted) (quot *159 ing United States v. Klein, 80 U.S. (13 Wall.) 128, 146 (1872)). Such decisions show clear adherence to the precept that "[a] Judiciary free from control by the Executive and Legislature is essential if there is a right to have claims decided by judges who are free from potential domination by other branches of government." N. Pipeline Constr. Co. v. Marathon Pipe Line Co., 458 U.S. 50, 58 (1982) (plurality) (quoting Will, 449 U.S. at 217-18).[8]
¶ 11. These separation of powers principles, established at the founding of our nation and enshrined in the structure of the United States Constitution, inform our understanding of the separation of powers under the Wisconsin Constitution. Like its federal counterpart, "[o]ur state constitution . . . created three branches of government, each with distinct functions and powers," and "[t]he separation of powers doctrine is implicit in this tripartite division." Panzer v. Doyle, 2004 WI 52, ¶ 48, 271 Wis. 2d 295, 680 N.W.2d 666, overruled on other grounds by Dairyland Greyhound Park, Inc. v. Doyle, 2006 WI 107, 295 Wis. 2d 1, 719 N.W.2d 408. Three clauses of the Wisconsin Constitution embody this separation: Article IV, Section 1 ("[t]he legislative power shall be vested in a senate and assembly"); Article V, Section 1 ("[t]he executive power *160 shall be vested in a governor"); and Article VII, Section 2 ("[t]he judicial power . . . shall be vested in a unified court system"). See State v. Washington, 83 Wis. 2d 808, 816, 266 N.W.2d 597 (1978). Before discussing in greater detail Wisconsin's law of separated powers and judicial independence, we will first describe the collision between branches in the present case: the Board's disciplinary review of Judge Gabler's decision to postpone a criminal defendant's sentencing.
II. BACKGROUND
I 12. At the outset, it is important to understand the context in which Judge Gabler made the challenged January 2012 decision. The Eau Claire District Attorney's office filed a criminal complaint in late July 2011 alleging that Leigh M. Beebe sexually assaulted K.L., a minor. An amended complaint filed in early August added charges against Beebe for allegedly sexually assaulting K.H., also a minor. Initially, Judge Gabler set a January 2012 trial for all charges in the amended complaint, but in December 2011 he granted Beebe's severance motion and ordered separate trials for the charges involving each victim. At the January trial, a jury convicted Beebe of sexually assaulting K.L.
¶ 13. At a subsequent scheduling conference on January 18, 2012, Judge Gabler scheduled Beebe's trial on the charges involving K.H. for August 7-8, 2012. The State then asked Judge Gabler to sentence Beebe immediately for the January conviction. Invoking the victims rights statute to argue that K.L. was "entitled to some finality," the assistant district attorney suggested that the court should not "delay [sentencing Beebe] for seven, eight or longer months to resolve . . . other matters."
*161 ¶ 14. After considering the State's arguments, Judge Gabler exercised his discretion and denied the State's request to sentence Beebe for the January conviction before the August trial. He began by considering K.L.'s rights as a victim. Referring to Wis. Stat. § 950.04(lv)(k), which assures victims a "speedy disposition" of cases to "minimize the length of time they must endure the stress of their responsibilities" in a criminal matter, Judge Gabler observed that because K.L. had already testified at trial "her active participation in the matter, other than giving a . . . victim statement at the sentencing, [was] concluded." He also noted that the terms of Beebe's bond would continue to keep K.L. safe from her assailant. Turning to Beebe's rights as a defendant, Judge Gabler acknowledged that sentencing him to prison could leave him with inadequate access to his attorney as they prepared for a complicated second trial. Finally, Judge Gabler considered the efficient administration of justice. Allowing time for the Department of Corrections (DOC) to prepare a presentence investigation report would delay sentencing on the January conviction until at least early April, and sentencing Beebe to prison would "impose [] a huge burden on the court and on the county to retrieve him" for an August trial.
¶ 15. K.L. contacted the Department of Justice's Office of Crime Victim Services (CVS) in April 2012 to express concern about Judge Gabler's decision to postpone Beebe's sentencing. The Victim Resource Center Coordinator brought this concern to Judge Gabler's attention in a June 2012 letter, explaining that K.L "want[ed] closure in her case as soon as possible" and that "[t]he long delay between the jury trial and sentencing [was] causing [K.L.] extreme stress and anxiety." Citing Article I, Section 9m of the Wisconsin *162 Constitution and Wis. Stat. § 950.04(lv)(k), the letter requested that Judge Gabler "consider sentencing Mr. Beebe as soon as possible."
¶ 16. In a responsive letter to CVS two weeks later, Judge Gabler expanded on the reasoning articulated at the January scheduling conference. The letter began and ended by recognizing K.L's rights as a victim and placing those rights in the context of his entire decision:
[K.L.'s] stress and anxiety and her rights as a victim are but one aspect of a variety of factors that I must consider in resolving this entire case.
[[Image here]]
... I understand and acknowledge the stress and anxiety that [K.L.] feels. I understand and acknowledge that the long delay between Mr. Beebe's January 11, 2012 conviction and his sentencing is not ideal. In my 13 years as a circuit court judge I have never had a case such as this where sentencing takes place more than two or three months after the conviction, but. .. this is an unusual case with unusual circumstances that are beyond my control. I have, to the best of my ability, taken into consideration all relevant factors based upon the timing of sentencing.
After describing the discretion that circuit courts possess to manage their busy dockets, Judge Gabler offered five detailed reasons for postponing sentencing: (1) if sentenced to prison, Beebe's "absence from the community would have a significant deleterious effect upon his attorney's ability to adequately prepare for trial"; (2) the DOC could not complete a sufficiently comprehensive presentence investigation until after the August trial because "Beebe . . . constitutionally [could not] be compelled to discuss any facts or circumstances relating to the alleged sexual assault of [K.H.]" *163 before the trial; (3) whether a jury convicted Beebe at the August trial would affect the appropriate sentence for the January conviction; (4) conducting two sentenc-ings would "cause other governmental agencies or departments to spend money unnecessarily" because it "would require the Sheriff to [retrieve] him [for the August trial] and would require the [DOC] to conduct two separate presentence investigations"; and (5) Beebe's likely appeal from the sentence would seriously hamper proceedings in the second trial "because the entire court file [would be] physically shipped ... to the [c]ourt of [a]ppeals."
¶ 17. Judge Gabler therefore declined to accelerate Beebe's sentencing in response to the letter.[9] Beebe pled no contest to all remaining charges against him on August 6, 2012, and on October 18, 2012, Judge Gabler imposed sentence with respect to both the January and August convictions.
¶ 18. K.L. submitted a formal complaint to the Board on August 2, 2012. The complaint alleged that *164 Judge Gabler's decision to postpone sentencing abridged her speedy disposition right under Wis. Stat. § 950.04(lv)(k) and her rights to timely disposition and protection from the accused under Article I, Section 9m of the Wisconsin Constitution. Judge Gabler received notice of the complaint on October 23, 2012, and he and his attorney submitted responses the following month.
f 19. The Board issued a probable cause determination in February 2013. Under the heading "Conclusions of Law," the Board asserted — without analysis —its authority to review Judge Gabler's decision:
Respondent Gabler is a "public employee" and a "public official" within the meaning of Wis. Stat. § 950.09(2)(a).... Gabler is also a "judge" within the meaning of Wis. Stat. § 950.09(2)(b). Gabler is therefore subject to the Board's statutory authority to determine whether there is probable cause to believe that he violated any of the crime victim rights alleged by K.L.
Based on the evidence in its possession,[10] the Board did not find probable cause to conclude that Judge Gabler violated K.L's right to protection from Beebe during the criminal proceedings. It did, however, find probable cause to conclude that Judge Gabler violated K.L's statutory and constitutional rights to a timely disposition of the criminal matter by postponing Beebe's sentencing on the January 2012 conviction. An order accompanying the probable cause determination *165 offered both K.L. and Judge Gabler the opportunity to request an evidentiary hearing and challenge any of the Board's preliminary findings of fact.
¶ 20. Judge Gabler responded in early March 2013 with a motion seeking dismissal of both the complaint and the probable cause determination. Among other bases for dismissal, he insisted that "the Board's review of [his] decisions intrude [d] upon the judiciary's core constitutional powers and violate [d] the separation of powers doctrine." As alternative relief in the event the Board denied his motion to dismiss, he also requested an evidentiary hearing to develop the factual record underlying his discretionary decisions.
¶ 21. The Board denied his motion on July 24, 2013, and, two days later, issued its Final Decision and Order (the "Decision") on K.L.'s complaint. Once again, the Board determined, without analysis, that Judge Gabler met the definition of "public employee" and "public official" in Wis. Stat. § 950.09(2)(a) and was "therefore subject to the Board's statutory authority to determine whether he violated the rights of a crime victim under Wis. Stat. ch. 950, Wis. Stat. ch. 938, or [A]rticle I, [S]ection 9m of the Wisconsin Constitution, and to impose a remedy for any rights violation found."[11] Following a discussion that mirrored its probable cause analysis, the Board stated its conclusion regarding K.L.'s speedy disposition right:
[T]he four factors identified at the January 18, 2012, scheduling conference as the basis for delaying Beebe's *166 sentencing until after the August 7-8, 2012, trial, singly or in combination, lacked a factual basis, a legal basis, or both; unreasonably delayed Beebe's sentencing; and therefore violated K.L.'s crime victim right under Wis. Stat. § 950.04(lv)(k) to a speedy disposition of the case in which K.L. was involved.
Based on this conclusion, "the Board also determine [d] that Gabler violated K.L.'s constitutional right to timely disposition of the case as to which K.L. was a crime victim." The Board identified no difference between the statutory and constitutional rights: "Although a crime victim's right to timely or speedy disposition of the case has both a constitutional and a statutory foundation, the different foundations have no practical effect on the proceedings in this case."
¶ 22. As a remedy for Judge Gabler's actions that the Board determined violated K.L.'s statutory and constitutional rights, the Board chose to "issue a Report and Recommendation directed to Gabler consistent with [its] Final Decision and Order."[12] Attached to its Decision, the Board included a formal notice of each party's right to file an appeal in the circuit court.
f 23. Judge Gabler initiated this review of the Board's Decision under Chapter 227 of the Wisconsin Statutes. In a thorough opinion, the Eau Claire County Circuit Court reversed the Board's Decision and remanded the matter to the Board with instructions to dismiss with prejudice the complaint against Judge *167 Gabler. The Board appealed, and we granted Judge Gabler's petition to bypass the court of appeals.
III. STANDARD OF REVIEW
A. Chapter 227 Review
f 24. "When a party appeals to the court of appeals or seeks review in this court 'from a circuit court order reviewing an agency decision,' the appellate court reviews the decision of the agency, not the decision of the circuit court." Rock-Koshkonong Lake Dist. v. DNR, 2013 WI 74, ¶ 53, 350 Wis. 2d 45, 833 N.W.2d 800 (quoting Lake Beulah Mgmt. Dist. v. DNR, 2011 WI 54, ¶ 25, 335 Wis. 2d 47, 799 N.W.2d 73). Accordingly, we review the Board's Decision rather than the circuit court's reversal of that Decision, although we benefit from the circuit court's analysis. Adams v. State Livestock Facilities Siting Review Bd., 2012 WI 85, ¶ 24, 342 Wis. 2d 444, 820 N.W.2d 404.
¶ 25. "Administrative decisions which adversely affect the substantial interests of any person, whether by action or inaction, whether affirmative or negative in form, are subject to review as provided in" Chapter 227. Wis. Stat. § 227.52. A court conducting a Chapter 227 review "shall set aside or modify the agency action if it finds that the agency has erroneously interpreted a provision of law and a correct interpretation compels a particular action." Wis. Stat. § 227.57(5). The reviewing court shall, however, accord "due weight" to the "experience, technical competence, and specialized knowledge of the agency involved, as well as discretionary authority conferred upon it." Wis. Stat. § 227.57(10).
*168 ¶ 26. Emphasizing its experience exercising its legislatively delegated authority to review crime victim rights complaints, the Board argues that this court should give "great weight" deference to its Decision. Wisconsin's case law states that, "[w]hile statutory interpretation is normally a question of law determined independently by a court, a court may give an agency's interpretation of a statute great weight deference, or due weight deference, or no deference." Rock-Koshkonong, 350 Wis. 2d 45, ¶ 59 (footnotes omitted). The deference framework, however, is inap-posite in this case because we must determine whether an executive agency's review of a circuit court's decision comports with the separation of powers under the Wisconsin Constitution. We review that question of constitutional law de novo. Schilling v. CVRB, 2005 WI 17, ¶ 12, 278 Wis. 2d 216, 692 N.W.2d 623; see also Coulee Catholic Sch. v. LIRC, 2009 WI 88, ¶ 31, 320 Wis. 2d 275, 768 N.W.2d 868.
B. The Constitutionality of a Statute
¶ 27. The parties also dispute the appropriate scope of this court's constitutional review of the Board's actions. Judge Gabler explains that "[h]e is arguing that ch. 950 is unconstitutional as applied by the [Board] in this case to a judge." But the Board counters that, because Judge Gabler challenges Wis. Stat. § 950.09(2)(a), (2)(c)-(d), and (3) to the extent those portions of the statute affect judges, his claim, to succeed, must satisfy the requirements for a facial challenge.
¶ 28. The Board directs our attention to Doe v. Reed, 561 U.S. 186 (2010), in which the Supreme Court considered whether, under a state public records law, *169 disclosure of petitions in support of a statewide referendum would violate the First Amendment rights of people who signed the petitions. Although the parties disagreed whether to treat the claim as a facial or an as-applied challenge, the Court observed that " [i]t obviously ha[d] characteristics of both":
The claim is "as applied" in the sense that it does not seek to strike the [public records law] in all its applications, but only to the extent it covers referendum petitions. The claim is "facial" in that it is not limited to plaintiffs' particular case, but challenges application of the law more broadly to all referendum petitions.
Id. at 194. Explaining that "[t]he label is not what matters,"[13] the Court identified an essential attribute of the hybrid challenge: "plaintiffs' claim and the relief that would follow . . . reach beyond the particular circumstances of these plaintiffs." Id. Consequently, the Court determined that the plaintiffs could prevail only if they met the standards for a facial challenge. Id.
¶ 29. We agree with the Board that Judge Ga-bler's challenge parallels the Supreme Court's characterization of the challenge in Reed:
Gabler's claim is as-applied in that it does not seek to invalidate Wis. Stat. § 950.09 [2] (a), (c)-(d), and (3) in all applications, but only to the extent they cover the activities of judges. Gabler's claim is nonetheless facial in that it is not limited to Gabler's specific circum *170 stances, but more broadly challenges all applications of those provisions to judges.
Judge Gabler by no means seeks to invalidate the entirety of Chapter 950 as contrary to the Wisconsin Constitution. But he does contend that the Board can never constitutionally take action against a judge under Wis. Stat. § 950.09(2)(a), (2)(c)-(d), or (3). To prevail, Judge Gabler therefore must meet the standard for a facial challenge and demonstrate that the disputed portions of Wis. Stat. § 950.09 "cannot be constitutionally enforced" by the Board against judges "under any circumstances." Tammy W-G. v. Jacob T., 2011 WI 30, ¶ 46, 333 Wis. 2d 273, 797 N.W.2d 854 (quoting Soc'y Ins. v. LIRC, 2010 WI 68, ¶ 26, 326 Wis. 2d 444, 786 N.W.2d 385).
IV. ANALYSIS
f 30. When delineating the Wisconsin Constitution's lines of demarcation separating governmental powers, this court has observed that "[t]he constitutional powers of each branch of government fall into two categories: exclusive powers and shared powers. Each branch has exclusive core constitutional powers into which other branches may not intrude." State v. Horn, 226 Wis. 2d 637, 643, 594 N.W.2d 772 (1999) (citing State ex rel. Friedrich v. Cir. Ct. for Dane Cty., 192 Wis. 2d 1, 13, 531 N.W.2d 32 (1995)). "This court is highly mindful of the separation of powers. It does not engage in direct confrontation with another branch of government unless the confrontation is necessary and unavoidable." State v. Moore, 2015 WI 54, ¶ 91, 363 Wis. 2d 376, 864 N.W.2d 827; see also Integration of Bar Case, 244 Wis. 8, 48, 11 N.W.2d 604 (1943) ("The *171 state suffers essentially by every. . . assault of one branch of the government upon another; and it is the duty of all the co-ordinate branches scrupulously to avoid even all seeming of such." (quoting In re Goodell, 39 Wis. 232, 240 (1875)).
f 31. Confronting this attack on judicial independence is both necessary and unavoidable. "[P]ower is of an encroaching nature and ... it ought to be effectually restrained from passing the limits assigned to it." Federalist No. 48, supra, at 305. The preservation of liberty in Wisconsin turns in part upon the assurance that each branch will defend itself from encroachments by the others. "[C]ore zones of authority are to be 'jealously guarded' by each branch of government," Barland v. Eau Claire Cty., 216 Wis. 2d 560, 573, 575 N.W.2d 691 (1998) (citing Friedrich, 192 Wis. 2d at 14), meaning "[t]he co-ordinate branches of the government. . . should not abdicate or permit others to infringe upon such powers as are exclusively committed to them by the constitution," Rules of Court Case, 204 Wis. 501, 514, 236 N.W. 717 (1931). Each branch's core powers reflect "zones of authority constitutionally established for each branch of government upon which any other branch of government is prohibited from intruding. As to these areas of authority, . . . any exercise of authority by another branch of government is unconstitutional." State ex rel. Fiedler v. Wis. Senate, 155 Wis. 2d 94, 100, 454 N.W.2d 770 (1990) (citing In re Complaint Against Grady, 118 Wis. 2d 762, 776, 348 N.W.2d 559 (1984)).[14]
*172 f 32. Consequently, "one branch of the government has no authority to compel a co-ordinate branch to perform functions of judgment and discretion that are lawfully delegated to it by the constitution." Outagamie Cty. v. Smith, 38 Wis. 2d 24, 39-40, 155 N.W.2d 639 (1968). To ensure that each branch will act on its own behalf and free from improper influence by the others, the Wisconsin Constitution parallels Article III of the federal Constitution and insulates individual governmental actors from personal manipulation. See Wis. Const. art. IV, § 26(2) ("Except as provided in this subsection, the compensation of a public officer may not be increased or diminished during the term of office . . . .").
f 33. The Board contends this case does not implicate exclusive judicial power. Because Article I, Section 9m of the Wisconsin Constitution states that "[t]he legislature shall provide remedies for the violation of this section," the Board insists that the power to remedy violations of crime victim rights is, at most, shared between the judiciary and the legislature, which delegated its authority to an executive entity. The Board therefore contends that its review of Judge Gabler's decision neither unduly burdened nor substantially interfered with the judiciary's constitutional authority.
¶ 34. "Shared powers lie at the intersections of the[] exclusive core constitutional powers." Horn, 226 Wis. 2d at 643. The separation of powers doctrine "envisions a system of separate branches sharing many powers while jealously guarding certain others, *173 a system of 'separateness but interdependence, autonomy but reciprocity.' " Friedrich, 192 Wis. 2d at 14 (quoting Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 635 (1952) (Jackson, J., concurring)). Like the federal Constitution,[15] the Wisconsin Constitution enumerates a calibrated structure of powers shared between the branches. See, e.g., Wis. Const, art. V, § 10(l)(a)-(b) (providing that "[e]very bill which shall have passed the legislature shall, before it becomes a law, be presented to the governor" and, "[i]f the governor approves and signs the bill, the bill shall become law"). For the Wisconsin judiciary, this means that the legislature retains the power to remove justices and judges through impeachment or address. See Wis. Const, art. VII, §§ 1, 11, 13.
¶ 35. In its shared powers decisions, this court has acknowledged that some legislative actions affecting the courts do not contravene the separation of powers.[16] But "the legislature is prohibited from unduly burdening or substantially interfering with the judicial branch." State v. Holmes, 106 Wis. 2d 31, 68, 315 N.W.2d 703 (1982). Thus, "[w]hen 'the exercise of *174 administrative and legislative power ha[s] so far invaded the judicial field as to embarrass the court and impair its proper functioning,' the court will be 'compelled to maintain its integrity as a constitutional institution.' " Id. at 69 (second alteration in original) (quoting Integration of Bar, 244 Wis. at 49).
¶ 36. We disagree with the Board's characterization of this case as presenting a question of shared powers. Regardless of any responsibility shared between the legislature and judiciary for remedying violations of victims' rights, this case raises a more fundamental constitutional question: May an executive agency, acting pursuant to authority delegated by the legislature, review a Wisconsin court's exercise of discretion, declare its application of the law to be in error, and then sanction the judge for making a decision the agency disfavors? Applying separation of powers principles, we conclude that the answer to this question is unequivocally no. Any other response would unconstitutionally permit an executive entity to substitute its judgment for that of the judge— effectively imposing an executive veto over discretionary judicial decision-making and incentivizing judges to make decisions not in accordance with the law but in accordance with the demands of the executive branch in order to avoid a public rebuke reinforced with the imprimatur of a quasi-judicial board.
A. Invasion of Core Judicial Powers
f 37. No aspect of the judicial power is more fundamental than the judiciary's exclusive responsibility to exercise judgment in cases and controversies *175 arising under the law. "It is emphatically the province and duty of the judicial department to say what the law is." Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177 (1803). As Alexander Hamilton famously explained, "[t]he judiciary . . . has no influence over either the sword or the purse;... [i]t may truly be said to have neither force nor will but merely judgment." Federalist No. 78, supra, at 464 (Alexander Hamilton) (emphasis added; capitalization omitted). By vesting the judicial power in a unified court system, the Wisconsin Constitution entrusts the judiciary with the duty of interpreting and applying laws made and enforced by coordinate branches of state government. The constitution's grant of judicial power therefore encompasses "the ultimate adjudicative authority of courts to finally decide rights and responsibilities as between individuals." State v. Williams, 2012 WI 59, ¶ 36, 341 Wis. 2d 191, 814 N.W.2d 460 (citing State v. Van Brocklin, 194 Wis. 441, 443, 217 N.W. 277 (1927)).
f 38. "For more than a century, this court has been called upon to resist attempts by other branches of government to exercise authority in an exclusively judicial area." Grady, 118 Wis. 2d at 778.[17] When *176 navigating inter-branch disputes, this court preserves a place of paramount importance for the principle that "a truly independent judiciary must be free from control by the other branches of government." Grady, 118 Wis. 2d at 782 (citing Will, 449 U.S. at 217-19). To protect that independence, this court has consistently rejected any attempt "to coerce judges in their exercise of the essential case-deciding function of the judiciary." Id. Permitting an executive agency to review judges' official actions for compliance with the victims' rights laws would upend the constitutional structure of separated powers, which allocates independent judicial power to the courts.
f 39. Resolute resistance to intrusions across the constitutionally constructed judicial perimeter does not represent a power play by one branch vis-a-vis another. "The purpose of the separation and equilibration of powers in general. . . was not merely to assure effective government but to preserve individual freedom." Morrison v. Olson, 487 U.S. 654, 727 (1988) (Scalia, J., dissenting). If the judiciary passively permits another branch to arrogate judicial power unto itself, however estimable the professed purpose for asserting this prerogative, the people inevitably suffer. If the power to perform judicial duties is subject to formal penalties imposed under color of law by another branch of government, the people lose their independent arbiters of the law, the balance of powers tips, and the republican form of government is lost.
f 40. Decades ago, this court recognized the peril presented by seemingly sensible legislative acts designed to compel proper performance of judicial duties. In re Complaint Against Grady, 118 Wis. 2d 762, 348 *177 N.W.2d 559 (1984), considered the constitutionality of a "statute requiring the withholding [of] a judge's salary for failure to decide cases within a specified time." Id. at 782. Checking legislative drift into the judicial domain, this court held that "[t]he setting and enforcement of time periods for judges to decide cases lies within an area of authority exclusively reposed in the judicial branch of government." Id. at 783. The court recognized that allowing the legislature to mandate deadlines for judges to resolve cases would threaten the judiciary's "independen[ce] in the fulfillment of its constitutional responsibilities." Id. at 782.
¶ 41. By issuing a Decision concluding that Judge Gabler violated a victim's constitutional and statutory rights to prompt disposition of cases, the Board encroached on the exclusive judicial authority identified in Grady. The Grady court rebuffed the legislature's imposition of time limits not because the court opposed the timely administration of justice but because the legislature mandated particular judicial action. In the present case, the Board claims that the executive now possesses authority to influence the timeline for judicial decision-making in matters involving victims' rights. Like the Grady court rejecting legislative control of judicial dockets, we refuse to countenance executive interference with matters pending before the courts. The judicial power vested in Wisconsin's unified court system presumes that courts balance the legal rights of all interested parties when exercising discretion in pending matters, and our constitution and statutes make clear that courts must consider victims as part of that evaluation. But important legal protections for victims do not vest the executive branch with newfound authority to contravene bedrock principles of judicial independence.
*178 ¶ 42. Indeed, the Board's Decision, as well as its Report and Recommendation directed at Judge Gabler under Wis. Stat. § 950.09(3), seem mild in comparison to other means by which the Board asserts authority to influence judicial decision-making. Most significantly, the Board could financially penalize a judge for exercising legal judgment by pursuing a civil action to assess a forfeiture under Wis. Stat. § 950.09(2)(d) and § 950.11. As the United States Supreme Court has observed in the judicial immunity context, personal "[l]iability to answer to every one who might feel himself aggrieved by the action of the judge .. . would destroy that independence without which no judiciary can be either respectable or useful." Bradley, 80 U.S. (13 Wall.) at 347. A possible financial penalty levied on a judge if an executive board disagrees with the judge's decision conjures thoughts of the ruinous commingling of governmental powers that preceded adoption of the federal Constitution.
¶ 43. In observing that the Board stopped short of imposing the full panoply of statutorily available penalties against Judge Gabler, we do not mean to imply that the remedies elected by the Board are inconsequential. It is one thing for citizens, politicians, or the media to criticize or second-guess judges, a cherished right that our constitutions, and this court, shield from infringement. It is a different matter entirely for the legislature to usurp constitutionally vested judicial power, adorn an executive department with all the trappings of a court, and empower that body to declare a judge's decisions in violation of a victim's constitutional and statutory rights. The disciplinary sting of the Board's actions was no less deleterious to Judge Gabler than if imposed by this court— the only body constitutionally permitted to prescribe it.
*179 f 44. Availability of Chapter 227 review of the Board's decisions does not, as the Board suggests, cure a separation of powers violation because judicial review of the Board's decisions does not eliminate the external interference with official judicial action. If a judge must account for the possibility that an executive body will administer sanctions in response to the judge's discretionary decision in an official capacity, eventual Chapter 227 review does not abate the executive branch's encroachment on judicial independence. A judge cannot fulfill the constitutional duty to interpret the law in a truly neutral and impartial manner if the threat of personal legal consequences lurks in the background of every case. As Judge Gabler observes in his brief, an appellate court might affirm a judge's legal determination, but the Board could nevertheless sanction that judge for the same decision — creating an incentive for judges to decide cases in a manner inconsistent with prevailing law. Regardless of whether a court ultimately reviews the Board's decisions, allowing a coordinate branch of government to exert influence over judicial decision-making would contravene the Wisconsin Constitution's carefol allocation of governmental powers, which prevents competition between a judge's personal interests and constitutional responsibilities.
¶ 45. An exchange during oral argument in this case highlights the untenable scenarios that could arise if we accept the Board's characterization of the scope of its authority. The Solicitor General conceded that the Board's broad understanding of its own authority under Wis. Stat. § 950.09 could allow it to take action on a complaint against the Wisconsin Supreme Court. If the Board determined that the justices of this court violated a victim's right to prompt disposition of a case, for example, it might publicly reprimand the *180 members of this court under Wis. Stat. § 950.09(2)(a) or even pursue a forfeiture under § 950.09(2)(d). To challenge the Board's determination, the members of this court would need to initiate a Chapter 227 action. But that Chapter 227 action would place a circuit court— and perhaps the intermediate court of appeals — in the absurd, not to mention unconstitutional, position of reviewing the Wisconsin Supreme Court's interpretation of the law. Subjecting this court's decisions to review by a circuit court would obviously interfere with our duties and responsibilities as Wisconsin's court of last resort. See Wis. Const. art. VII, § 3(2) ("The supreme court has appellate jurisdiction over all courts . . . ."); see also Williams, 341 Wis. 2d 191, ¶ 36 & n.13 (citing Marbury, 5 U.S. (1 Cranch) at 177).
f 46. The Board ultimately fails to recognize that its Decision constituted quasi-judicial review of a judge's legal judgment. In essence, the Board asserts the power to authoritatively decide whether a judge's official act comported with Wisconsin law, including the Wisconsin Constitution. This assertion of power contravenes the principle, judicially acknowledged in Marbury and respected for over two hundred years, that it is the province of the judiciary, not the executive, to say what the law is. Consistent with this venerable principle, our constitution vests the judicial power in Wisconsin's unified court system, and that judicial power confers on judges an exclusive responsibility to exercise independent judgment in cases over which they preside. Because an executive board cannot interfere with the legal determinations judges make in an official capacity — much less declare them in violation of the constitution — the Board's claimed authority violates Wisconsin's structural separation of governmental powers.
*181 B. Infringement on This Court's Disciplinary Authority
¶ 47. Accepting the Board's expansive conception of its own power would also infringe on this court's exclusive authority to discipline judges. Article VII, Section 11 of the Wisconsin Constitution provides that "[e]ach justice or judge shall be subject to reprimand, censure, suspension, removal for cause or for disability, by the supreme court pursuant to procedures established by the legislature." (Emphasis added.)[18] Wisconsin Stat. § 757.83(l)(a) establishes the judicial commission, which investigates and prosecutes allegations of judicial misconduct. See Wis. Stat. §§ 757.85, 757.89. Importantly, if the judicial commission's prosecution of alleged misconduct results in a recommendation that a judge be disciplined, this court "review[s] the findings of fact, conclusions of law and recommendations . . . and determine [s] appropriate discipline in cases of misconduct." Wis. Stat. § 757.91. By assigning exclusive responsibility for judicial discipline to this court, the Wisconsin Constitution precludes the legislative and executive branches from compromising independent adjudication in Wisconsin courts.
f 48. Allowing the Board to take disciplinary action against judges under Wis. Stat. § 950.09(2)(a), (c), and (d) would clearly contradict the constitution. "The Wisconsin Constitution provides four disciplinary alternatives for judicial misconduct: reprimand, censure, suspension and removal." In re Judicial Disciplinary Proceedings Against Aulik, 146 Wis. 2d 57, 77, *182 429 N.W.2d 759 (1988) (citing Wis. Const. art. VII, § 11). By its plain text, a "reprimand" of a judge under § 950.09(2)(a) would usurp this court's authority to "reprimand" under the Wisconsin Constitution by declaring a judge's conduct improper through a formal adjudicatory process. Cf. Reprimand, Black's Law Dictionary 1495 (10th ed. 2014) ("In professional legal responsibility, a form of disciplinary action that is imposed after trial or formal charges and declares the lawyer's conduct to be improper but does not limit his or her right to practice law . . . ."). And while this court's constitutional judicial discipline power does not expressly include the authority to assess a forfeiture or impose an equitable remedy, as § 950.09(2)(c) and (d) permit, allowing the legislature to create an executive board with the power to penalize or enjoin official judicial action would be anathema to the judicial independence preserved by the separation of governmental powers under the Wisconsin Constitution. We cannot sustain an arrangement that sabotages the judiciary's structural independence.
¶ 49. Nor will we permit an executive board to arrogate reprimand authority to itself by cloaking its action in other terms. Cf. Wisconsin Carry, Inc. v. City of Madison, 2017 WI 19, ¶ 19, 373 Wis. 2d 543, 892 N.W.2d 233 ("We are not merely arbiters of word choice."). Here, the Board gave Judge Gabler notice of K.L.'s complaint, issued a probable cause determination, provided an opportunity to object, offered (but declined to hold) an evidentiary hearing, and issued its formal Decision. The Board determined that Judge Gabler violated K.L.'s statutory and constitutional rights, indicated that it would issue a public Report and Recommendation confidentially "directed to" Judge Gabler, and notified him of his right to appeal. *183 These procedures resemble the judicial commission's procedures for investigating and prosecuting a judicial misconduct complaint. See Wis. Stat. §§ 757.85, 757.89. By subjecting Judge Gabler to these quasi-judicial proceedings, issuing a Decision that bore the imprimatur of disciplinary authority, and concluding that Judge Ga-bler violated a victim's statutory and constitutional rights as a matter of law, the Board intruded on this court's exclusive authority to reprimand judges, regardless of the label affixed to its action.
¶ 50. We therefore conclude that Wis. Stat. § 950.09(2)(a), (2)(c)-(d), and (3) and § 950.11 cannot constitutionally apply to judges because they invade two exclusive aspects of judicial authority: the judicial power vested in the unified court system and the disciplinary function vested in this court.[19] This strict conservation of the judiciary's structural independence blocks the other branches from interfering with individual rights by manipulating judicial outcomes.
V. ADDITIONAL CONSIDERATIONS
A. Constitutional Avoidance
¶ 51. Alongside the separation of powers issue, the Board argues that we should reverse the circuit court's decision because the Board did not violate *184 Judge Gabler's right to procedural due process, any procedural errors the Board committed did not impair the fairness of its actions, the Board had jurisdiction over K.L.'s complaint, and substantial evidence supported the Board's Decision. "This court does not normally decide constitutional questions if the case can be resolved on other grounds." Adams Outdoor Advertising, Ltd. v. City of Madison, 2006 WI 104, ¶ 91, 294 Wis. 2d 441, 717 N.W.2d 803 (quoting Labor & Farm Party v. Elections Bd., 117 Wis. 2d 351, 354, 344 N.W.2d 177 (1984)). This case is incapable of resolution without deciding the constitutional conflict presented by the Board's exercise of its statutory powers.
f 52. Constitutional avoidance is "a matter of judicial prudence" and does not apply where the constitutionality of a statute is "essential to the determination of the case." Kollasch v. Adamany, 104 Wis. 2d 552, 561, 313 N.W.2d 47 (1981); see Clay v. Sun Ins. Office Ltd., 363 U.S. 207, 223-24 (1960) (Black, J., dissenting) ("[T]here is a judicial practice . . . under which courts do not ordinarily decide constitutional questions unless essential to a decision of the case. . . . But even the greatest of our judges have not always followed it as a rigid rule. Perhaps had they done so the great opinion of Chief Justice Marshall in Marbury v. Madison would never have been written."); Fleeman v. Case, 342 So. 2d 815, 818 (Fla. 1976); Hammond v. Bingham, 362 P.2d 1078, 1079 (Idaho 1961). Courts in other jurisdictions have also recognized that the principle of constitutional avoidance gives way where the constitutional question is of great public importance. See, e.g., State ex rel. Bland v. St. John, 13 So. 2d 161, *185 170 (Ala. 1943); Buckingham v. State ex rel. Killoran, 35 A.2d 903, 904-05 (Del. 1944).
¶ 53. Even if we agreed with the Board's non-constitutional arguments, we would nevertheless need to decide the essential question of whether the Wisconsin Constitution permits the Board to pursue disciplinary action against Judge Gabler, a separation of powers issue of great public importance. Neither party suggests any pertinent portion of Chapter 950 is ambiguous, and there is no saving construction of the statute that would cure its constitutional infirmity.[20] Since Chapter 950 is clear, the fundamental question presented is whether application of Chapter 950 to *186 judges violates the structural separation of powers.[21] Because we affirm the circuit court's decision on that essential constitutional question, we need not address the Board's other arguments.
B. First Amendment Right to Criticize Courts
¶ 54. Nothing in this opinion should be read as abridging political speech protected by the First Amendment to the United States Constitution. For all of the weight we assign to preserving the judiciary's independence from interference by the legislative and executive branches, we also recognize that public speech criticizing judges implicates different constitutional interests. The United States Supreme Court has held the "essential right of the courts to be free of intimidation and coercion ... to be consonant with a recognition that freedom of the press must be allowed in the broadest scope compatible with the supremacy of order." Pennekamp v. Florida, 328 U.S. 331, 334 (1946) (citing Bridges v. California, 314 U.S. 252, 263, 265-66 (1941)). Although judges, particularly elected judges, must always guard against allowing popular pressures to influence their judgment, public speech criticizing judges does not endanger judicial independence in the same manner as legislative or executive action seeking to exert control over judges.
¶ 55. This court has long recognized the value of open public discussion regarding the judiciary:
[C]ourts will not seek immunity from criticism by restraining the citizen or threatening the exercise of *187 the right of free speech. In a democracy the best interest of society is promoted by according to the citizen the greatest freedom in the matter of discussing the relative qualifications of candidates for public office and of freely criticising any governmental department. He has a right to express his views upon the question of whether any governmental department is functioning in a manner to promote the general welfare. This freedom of discussion is important in order that the citizen may be advised concerning the affairs of his government and placed in the possession of facts which will enable him, with such discrimination as he may possess, to form intelligent conclusions.
In re. Cannon, 206 Wis. 374, 406, 240 N.W. 441 (1932).
¶ 56. Consistent with this longstanding reverence for political speech, we emphasize that our holding does not constrain individuals or groups from criticizing judges. As the Supreme Court recently reaffirmed, the First Amendment protects not only individual speech but also speech by individuals acting in concert through a collective body. See Burwell v. Hobby Lobby Stores, Inc., 134 S. Ct. 2751, 2768 (2014); Citizens United v. FEC, 558 U.S. 310, 342 (2010). This opinion prohibits the legislature and the executive branch from transgressing the separation of powers by formally disciplining judges for exercising judgment, but the people may of course, individually or collectively, express opinions about judicial matters. Ultimately, because the people elect their judges in Wisconsin, they retain the strongest voice of all to approve or disapprove of judges and their decisions.
¶ 57. We caution, however, that reckless criticism of the courts risks undermining their role as a check on the legislative and executive branches.
*188 The members of society have become content to accept the decisions of courts in their controversies with their fellows, and they will remain content so long as they have confidence in their courts. Restlessness, discontent, and anarchy, however, will result with the passing of confidence in the integrity of the courts, and stable government will totter upon its foundations. It is for this reason that high-minded citizens refrain from impetuous and ill-founded criticism of the courts.
Cannon, 206 Wis. at 406-07. We by no means implore silence from our fellow citizens;[22] rather, we caution those who impugn the integrity of judicial decision-making that while the courts remain fervent guardians of speech, particularly political expression, the right to speak, when exercised irresponsibly, is not without cost to the stability of our republican form of government.
C. Respect for Victims' Rights
¶ 58. We close by reaffirming this court's commitment to upholding the crime victims' rights enshrined in our statutes and constitution. No less than we did a decade ago, "we believe that justice requires that all who are engaged in the prosecution of crimes make every effort to minimize further suffering by crime victims." Schilling, 278 Wis. 2d 216, ¶ 26. Earlier this *189 term, a concern about possible re-traumatization of victims influenced our decision permitting the Department of Justice to withhold requested public records— notwithstanding the strong public policy otherwise favoring disclosure. See Dem. Party of Wis. v. DOJ, 2016 WI 100, ¶¶ 14, 28-33, 372 Wis. 2d 460, 888 N.W.2d 584. Our decision today does not signal a departure from our consistent protection of victims' rights.
¶ 59. Although we prohibit the Board from disciplining judges because executive review of judicial decisions violates fundamental separation of powers principles, crime victims nonetheless have recourse for their grievances against judges. Wisconsin Stat. § 950.105 assures victims a mechanism for directly asserting their own rights in court. We reserve for future cases more comprehensive discussion of the interplay between victims' rights and procedural tools, such as intervention, writs of mandamus, and supervisory writs. Because victims may assert their rights in court, these procedural mechanisms could offer alternative remedies for victims seeking to vindicate their rights. And because these procedural means could offer recourse for victims within the unified court system, they would not pose a threat to the judiciary's independence ,[23]
*190 VI. CONCLUSION
¶ 60. The people bestowed much power on the legislature, comprised of their representatives whom the people elect to make the laws. However, ever vigilant in averting the accumulation of power by one body — a grave threat to liberty — the people devised a diffusion of governmental powers, placing judicial power, along with the authority to discipline judges, within the exclusive province of the independent judiciary. These powers may not be claimed by another branch. Just as the people of the United States at the founding of the Republic vested all federal judicial power in the Judiciary, the people of Wisconsin vested the Wisconsin judiciary with the power to exclude the coordinate branches of government from the judicial domain in order to safeguard judicial independence. The significance of preserving clear boundaries between the branches has been understood since the founding of our nation, with the role of the judiciary plainly recognized: "This independence of the judges *191 is equally requisite to guard the Constitution and the rights of individuals . . . Federalist No. 78, supra, at 468. By conferring on an executive board the power to review and discipline judges, the legislature contradicts the Wisconsin Constitution, violates the structural separation of powers, and threatens judicial independence. We therefore hold that Wis. Stat. § 950.09(2)(a), (2)(c)-(d), and (3) and § 950.11 are unconstitutional as applied to judges and declare the Board's Decision against Judge Gabler void.
By the Court. — The order of the circuit court is affirmed.
¶ 61. ANN WALSH BRADLEY, J., did not participate.

 All subsequent references to the Wisconsin Statutes are to the 2015-16 version unless otherwise indicated.

 The philosopher Charles Louis de Secondat, Baron de Montesquieu, is generally known simply by his title.

 For additional discussion of the philosophical bases for the separation of powers, as well as the doctrine's utility for achieving "the interconnected goals of preventing tyranny and *155 protecting liberty," see generally Rebecca L. Brown, Separated Powers and Ordered Liberty, 139 U. Pa. L. Rev. 1513, 1531—40 (1991).

 "Obviously, then, the Constitution's central mechanism of separation of powers depends largely upon common understanding of what activities are appropriate to legislatures, to executives, and to courts." Lujan v. Defenders of Wildlife, 504 U.S. 555, 559-60 (1992).

 See United States v. Klein, 80 U.S. (13 Wall.) 128, 147 (1872) ("It is the intention of the Constitution that each of the great co-ordinate departments of the government — the Legislative, the Executive, and the Judicial — shall be, in its sphere, independent of the others."); see also Loving v. United States, 517 U.S. 748, 757 (1996) ("Even when a branch does not arrogate power to itself, moreover, the separation-of-powers doctrine requires that a branch not impair another in the performance of its constitutional duties." (citing Mistretta v. United States, 488 U.S. 361, 397-408 (1989)).

 See also Victoria Nourse, Toward a "Due Foundation" for the Separation of Powers: The Federalist Papers as Political Narrative, 74 Tex. L. Rev. 447, 473-74 (1996) ("[T]o protect the institution, one must protect the persons within the institution. Private interest must not dictate public interest. Thus, individual officers should be as independent as possible from influence by other branches when it comes to matters in which their personal interest may obscure their public duties. And that means security for persons — the security from fear that one's livelihood will be at risk if one pursues the obligations of office." (footnote omitted)).

 For additional discussion of special legislation in colonial America, see generally Evan C. Zoldan, Reviving Legislative Generality, 98 Marq. L. Rev. 625, 660-79 (2014).

 See also The Federalist No. 78, at 465 (Alexander Hamilton) (Clinton Rossiter ed., 1961) ("The complete independence of the courts of justice is peculiarly essential in a limited Constitution."); cf. 1 William Blackstone, Commentaries on the Laws of England 269 (Philadelphia 1771) (noting that, if the legislature subsumes the judiciary, "the life, liberty, and property of the subject would be in the hands of arbitrary judges, whose decisions would be then regulated only by their own opinions, and not by any fundamental principles of law; which though legislators may depart from, yet judges are bound to observe").

 Testifying before the circuit court in the present case, Judge Gabler provided additional facts about his response to the letter, which he immediately thought might be an "impermissible ex parte communication involving a pending case." After considering the rules governing ex parte communications and consulting with a member of the judicial commission, Judge Gabler remained resolute in his decision not to adjust Beebe's sentencing date in response to the letter. He determined that any change might be the product of improper influence, and he observed that, if he notified the parties' attorneys that he was acting in response to the letter, he would violate the Wis. Stat. § 950.095 requirement that he keep the letter confidential. As the circuit court observed in its review of the Board's Decision, "the type of communication involved here was specifically directed to gain a procedural advantage, that is one party's desire to change the sentencing date without notice to any other parties to the criminal case."

 The propriety of the means by which the Board obtained the records underlying its probable cause determination, as well as its eventual Decision, was the subject of extensive discussion in the parties' briefs. Because we do not reach the due process, procedural irregularity, jurisdictional, or substantial evidence issues argued by the parties, we have not included a lengthy recitation of the facts related to those claims.

 Unlike in its probable cause determination, the Board apparently declined to exercise authority over Judge Gabler as a "judge" under Wis. Stat. § 950.09(2)(b), which permits the Board to refer judges to the judicial commission for alleged ethical violations.

 The Board's Report and Recommendation, which remains publicly available on its website, includes the Board's conclusion that "the court violated [K.L.'s] statutory right to a speedy disposition and constitutional right to a timely disposition." Because we now hold that the Board's Decision is void, so is the Board's remedy. We adopt the circuit court's judgment setting aside the Report and Recommendation in its entirety.

 See also Citizens United v. FEC, 558 U.S. 310, 331 (2010) ("[T]he distinction between facial and as-applied challenges is not so well defined that it has some automatic effect or that it must always control the pleadings and disposition in every case involving a constitutional challenge.").

 See also In re. Cannon, 206 Wis. 374, 382, 240 N.W. 441 (1932) ("Under our constitution the judicial and legislative departments are distinct, independent, and co-ordinate branches of the government. Neither branch enjoys all the *172 powers of sovereignty, but each is supreme in that branch of sovereignty which properly belongs to its department.").

 Cf. Mistretta, 488 U.S. at 426 (Scalia, J., dissenting) ("The Constitution ... is a prescribed structure, a framework, for the conduct of government. In designing that structure, the Framers themselves considered how much commingling was, in the generality of things, acceptable, and set forth their conclusions in the document.").

 See John F. Jelke Co. v. Beck, 208 Wis. 650, 660, 242 N.W. 576 (1932) ("In Wisconsin the jurisdiction and power of the courts is conferred not by act of the legislature but by the constitution itself. While the legislature may regulate in the public interest the exercise of the judicial power, it cannot, under the guise of regulation, withdraw that power or so limit and circumscribe it as to defeat the constitutional purpose.").

 See Barland v. Eau Claire Cty., 216 Wis. 2d 560, 575 N.W.2d 691 (1998) (circuit court's authority to remove judicial assistant despite collective bargaining agreement); In re Complaint Against Grady, 118 Wis. 2d 762, 348 N.W.2d 559 (1984) (time limits for judges to resolve cases); Integration of Bar Case, 244 Wis. 8, 11 N.W.2d 604 (1943) (regulation of attorneys); Cannon, 206 Wis. 374 (admission to the bar); Rules of Court Case, 204 Wis. 501, 236 N.W. 717 (1931) (statute requiring court to promulgate rules of practice and procedure); Thoe v. Chi., Milwaukee & St. Paul Ry. Co., 181 Wis. 456, 195 N.W. 407 (1923) (legislation defining the legal sufficiency of evidence); In re Court Room, 148 Wis. 109, 134 N.W. 490 (1912) (county regulation of courtroom facilities); In re Janitor of the *176 Supreme Court, 35 Wis. 410 (1874) (interference with appointment of supreme court employee).

 As noted above, this court shares the removal power with the legislature. See Wis. Const, art. VII, §§ 1, 11, 13. The people of Wisconsin also retain a portion of removal power through the recall process. See Wis. Const, art. XIII, § 12.

 Under Wis. Stat. § 950.09(2)(b), the Board may, however, refer a complaint alleging ethical violations against a judge to the judicial commission for proceedings, potentially culminating in review and disposition by this court. In this capacity, the Board has no greater authority than any other complainant filing a claim with the judicial commission. Interpretations of the law with which the Board may disagree do not belong before the judicial commission and are subject solely to appellate review.

 The dissent would interpret the term "public officials" in Wis. Stat. §§ 950.08-.09 to exclude judges. See, e.g., dissent, ¶ 133. But the statutes' plain language does not support this reading, nor did either party advance such a baseless argument. The search for a saving construction of a patently unconstitutional statute does not compel a court to adopt an absurd one. Although Chapter 950 does not define the term "public officials," the term's ordinary meaning undoubtedly encompasses judges. See State ex rel. Kalal v. Cir. Ct. for Dane Cty., 2004 WI 58, ¶ 45, 271 Wis. 2d 633, 681 N.W.2d 110 ("Statutory language is given its common, ordinary, and accepted meaning .. . ."). In Black's Law Dictionary, the definition of "public official" redirects to the first definition of "official," which means "[sjomeone who holds or is invested with a public office; a person elected or appointed to carry out some portion of a government's sovereign powers." Official, Black's Law Dictionary 1259 (10th ed. 2014). We have already established that Article VII, § 2 of the Wisconsin Constitution vests the judicial power in the unified court system, and there is no dispute that all Wisconsin judges are either appointed or elected to exercise that portion of the sovereign power. See Wis. Const. art. VII, §§ 4(1), 5(2), 7, 9. Nothing in the text of Chapter 950 supports a deviation from this plain meaning, thus setting up the inevitable constitutional conflict at issue in this case.

 See Bond v. United States, 134 S. Ct. 2077, 2098 (2014) (Scalia, J., concurring in the judgment) ("Since the Act is clear, the real question this case presents is whether the Act is constitutional as applied to petitioner." (emphasis omitted)).

 Bridges v. California, 314 U.S. 252, 270-71 (1941) ("The assumption that respect for the judiciary can be won by shielding judges from published criticism wrongly appraises the character of American public opinion. For it is a prized American privilege to speak one's mind, although not always with prefect good taste, on all public institutions. And an enforced silence, however limited, solely in the name of preserving the dignity of the bench, would probably engender resentment, suspicion, and contempt much more than it would enhance respect." (footnote omitted)).

 Availability of standing for victims under Wis. Stat. § 950.105 also undermines the Board's argument that referral to the judicial commission under Wis. Stat. § 950.09(2)(b) leaves victims without an adequate remedy. Specifically, § 950.09(2)(b) permits the Board to "[r]efer to the judicial commission a violation or alleged violation by a judge of the rights of crime victims." The Board expresses concern that a judge's alleged violations of a victim's rights might not satisfy the definition of misconduct necessary for the imposition of judicial discipline. Under Wis. Stat. § 757.81(4), an allegation *190 of "misconduct" charges a judge with committing a "[w]illful violation of a rule of the code of judicial ethics" — a serious ethical allegation.
We agree with the Board that Wis. Stat. § 757.81(4)(a) sets a high bar for proof of judicial misconduct, but we disagree that it leaves victims without a remedy. The Board misapprehends the proper role of the judicial commission, which does not exist to review judges' discretionary decisions. In Wisconsin, crime victims' rights are a matter of constitutional and statutory law, and Wis. Stat. § 950.105 confirms that victims may assert those rights in court. Accordingly, a victim who disagrees with a judge's legal determination may challenge that decision through existing procedural means within the court system. Contested discretionary decisions are not ethical transgressions and therefore do not belong before the judicial commission.