# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2019AP2054-OA |

| | |
|---|---|
| COMPLETE TITLE: | Wisconsin Small Business United, Inc., Amy Dailey, Larry Gierach, Doug Hustedt, Sandi Vandervest and Tom Vandervest, |
| |            Petitioners, |
| |     v. |
| | Joel Brennan, in his official capacity as Secretary of the Department of Administration, Peter Barca, in his official capacity as Secretary of the Department of Revenue and Carolyn Standford Taylor, in her official capacity as Acting Wisconsin Superintendent of Public Instruction, |
| |            Respondents. |

## ORIGINAL ACTION

| | |
|---|---|
| OPINION FILED: | July 10, 2020 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | April 20, 2020 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
|   COURT: | |
|   COUNTY: | |
|   JUDGE: | |

JUSTICES:

HAGEDORN, J., delivered the majority opinion of the Court, in which ROGGENSACK, C.J., ANN WALSH BRADLEY, ZIEGLER, and DALLET, JJ., joined.  REBECCA GRASSL BRADLEY, J., filed a dissenting opinion, in which KELLY, J., joined.

NOT PARTICIPATING:

ATTORNEYS:

For the petitioners, there were briefs filed by *Mike B. Wittenwyler, Kendall W. Harrison, Zachary P. Bemis*, and *Godfrey & Kahn, S.C.*, Madison. There was an oral argument by *Kendall W. Harrison*.

For the respondents there was a brief filed by *Colin Roth*, assistant attorney general, and *Hannah S. Jurss*, assistant attorney general; with whom on the brief was *Joshua L. Kaul*, attorney general. There was an oral argument by *Colin Roth*.

NOTICE

This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.

No. 2019AP2054-OA

STATE OF WISCONSIN : IN SUPREME COURT

**Wisconsin Small Businesses United, Inc., Amy Dailey, Larry Gierach, Doug Hustedt, Sandi Vandervest and Tom Vandervest,**

   **Petitioners,**

  **v.**

**Joel Brennan, in his official capacity as Secretary of the Department of Administration, Peter Barca, in his official capacity as Secretary of the Department of Revenue and Carolyn Standford Taylor, in her official capacity as Acting Wisconsin Superintendent of Public Instruction,**

   **Respondents,**

**FILED**

**JUL 10, 2020**

Sheila T. Reiff
Clerk of Supreme Court

---

HAGEDORN, J., delivered the majority opinion of the Court, in which ROGGENSACK, C.J., ANN WALSH BRADLEY, ZIEGLER, and DALLET, JJ., joined. REBECCA GRASSL BRADLEY, J., filed a dissenting opinion, in which KELLY, J., joined.

---

ORIGINAL ACTION for declaratory judgment. *Relief denied.*

¶1 BRIAN HAGEDORN, J. This is an original action challenging whether two partial vetoes in the 2017-19 biennial budget exceeded the governor's constitutional authority. While

the respondents defend the vetoes on their merits, they also contend this challenge is too late and should be barred by the equitable doctrine of laches. We agree that laches should be applied here. The respondents have proved the three elements of a laches claim——unreasonable delay, lack of knowledge a claim would be brought, and prejudice. And given the reliance interests at stake and the need for stability and certainty in the enactment of state budget bills, we exercise our discretion to apply laches based on the facts of this case. Accordingly, we dismiss the original action.

## I. BACKGROUND

¶2 Wisconsin's practice of funding the state's operations and programs through biennial budget bills is nearly a century old.[1] As points of reference, the state's fiscal year begins on July 1 and ends on the following June 30, and a new biennium commences every odd-numbered year. Wis. Stat. § 20.002(1) (2017-18).[2]

¶3 Each new biennial budget is a complex collaboration and negotiation between the executive and legislative branches.[3]

---

[1] See ch. 97, Laws of 1929; see also Richard A. Champagne, Legislative Reference Bureau, Wisconsin Executive Budget Bills, 1931-2019, at 1 (2020) (describing the biennial budget bill as "easily the most significant piece of legislation that is enacted during the entire legislative session").

[2] All subsequent references to the Wisconsin Statutes are to the 2017-18 version unless otherwise indicated.

[3] See Champagne, supra, at 1-6 (outlining the biennial budget process and its core principles).

Relying on fiscal estimates and projections from the various branches and agencies making up state government, the governor creates a budget bill and submits it to the legislature. See Wis. Stat. §§ 16.45, 16.46, 16.47. Once received, the bill is referred to the Joint Committee on Finance, which reviews, amends, and ultimately votes to recommend the revised bill for legislative passage. See § 16.47(1m); Wis. Stat. § 13.093 to § 13.102. Like any other bill, the biennial budget is then debated and may be amended by the two houses of the legislature. After passage by both houses, the bill is presented to the governor. Wis. Const. art. V, § 10(1)(a).

¶4 At this point, Article V, Section 10 of the Wisconsin Constitution gives the governor three options: sign the whole bill into law, veto the whole bill, or sign the bill into law while vetoing parts of it. Upon presentment, a bill becomes law if it receives the governor's approval and signature (or if he does not sign or veto it within six days (Sundays excepted)). Id. art. V, § 10(1)(b), § 10(3). When vetoed in whole, a bill returns to the legislature and may still become law if approved by two-thirds of both houses. Id. art. V, § 10(2)(a). A third option is unique to appropriation bills, including biennial budget bills. Namely, the governor may approve such bills in whole or in part. Id. art. V, § 10(1)(b).

¶5 This power to partially veto appropriations bills was added as an amendment to the constitution in 1930, but the people of Wisconsin have since modified it twice. The governor may not exercise his partial veto authority to create a new word

3

by rejecting individual letters in words, nor may he create a new sentence by combining parts of two or more sentences. Id. art V, § 10(1)(c). After any partial veto, the governor must return the rejected part with objections in writing to the legislature for its reconsideration. Id. art. V, § 10(2)(b). The legislature can override the veto if two-thirds of both houses agree to approve the rejected part. Id. Absent that, the enacted law remains; only parts approved by the governor become law. Id. art. V, § 10(1)(b).

¶6 Governor Scott Walker penned the partial vetoes at the heart of this dispute within Wisconsin's 2017-19 biennial budget. The governor signed that budget, with partial vetoes, and it went into effect as 2017 Wis. Act 59 on September 23, 2017. Two of Governor Walker's vetoes struck individual digits from dates written in numeral form. The petitioners (collectively WSBU)[4] contend that these digit vetoes violated the constitutional prohibition against creating new words by striking individual letters in words. Wis. Const. art. V, § 10(1)(c).

---

[4] The petition for original action was filed by Wisconsin Small Businesses United, Inc., Amy Dailey, Larry Gierach, Doug Hustedt, and Sandi and Tom Vandervest.

The named respondents were Secretary of the Department of Administration Joel Brennan, Secretary of the Wisconsin Department of Revenue Peter Barca, and Acting Wisconsin Superintendent of Public Instruction Carolyn Standford Taylor, each in his or her official capacity and all represented by the attorney general.

¶7 The first disputed provision of Act 59 is § 1641m. When presented to the governor, § 1641m imposed a one-year moratorium on an existing law that enabled school districts to increase their revenue limits by adopting a resolution based on energy efficiency efforts. 2017 A.B. 64, § 1641m. See generally Wis. Stat. § 121.91(4)(o). To accomplish this, the text sent to the governor's desk proposed the revenue-limit adjustment be effective "only to a resolution adopted after December 31, 2018." Exercising a partial veto, the governor struck the "1, 2" from "December 31, 2018" (December 3~~1, 2~~018), thereby changing the date to "December 3018." In effect, the proposed one-year moratorium was transformed into a one-thousand and one-year moratorium. 2017 Wis. Act 59, § 1641m (codified at § 121.91(4)(o)4.).

¶8 When the governor received the second disputed provision of Act 59, § 2265, it would have imposed a year-long delay for the implementation of 2013 Wis. Act 229. As signed into law in 2013, Act 229 authorized third-party lenders that provide credit by way of retailer-lender credit cards to take tax deductions for bad debts. 2017 A.B. 64, § 2265. See generally 2013 Wis. Act 229. Act 229 was originally scheduled to go into effect on July 1, 2015, but the 2015-17 budget moved the effective date to July 1, 2017. 2015 Wis. Act 55, § 4750. In its 2017-19 budget bill, the legislature twice used the date "July 1, ~~2017~~ 2018" to authorize another new effective date for Act 229. 2017 A.B. 64, § 2265. In other words, the law on the books when the bill arrived at the governor's desk had an

5

effective date of July 1, 2017, and the legislature sought to delete "2017" and add the year "2018." In exercising his veto pen, the governor rejected the legislature's effort to strike "20" and "7" and accepted the legislature's insertion of "8," creating a veto that looked like this: July 1, 20~~17~~ ~~201~~8. In effect, each use of July 1, 2018 was changed to July 1, 2078, and a one-year implementation delay was turned into a sixty-one-year delay. 2017 Wis. Act 59, § 2265.

¶9 The 2017-19 biennial budget, as modified by these and other partial vetoes, became law on September 23, 2017. No vetoes were overridden by the legislature, and the biennium came and went. In 2019, another biennial budget was proposed, negotiated, passed, and signed into law. The 2019-21 biennial budget went into effect as 2019 Wis. Act 9 on July 4, 2019. It wasn't until October 28, 2019, nearly four months after the old biennium had passed and the new biennial budget had been in effect, that WSBU filed this petition for original action. Having already granted a separate petition reviewing the governor's partial veto powers,[5] we granted WSBU's petition as well and heard arguments in both cases on the same day.

## II. DISCUSSION

¶10 While the respondents defend the constitutionality of the challenged vetoes, they also urge us not to reach the merits

---

[5] _Bartlett v. Evers_, No. 2019AP1376-OA, slip op. (Wis. S. Ct. July 10, 2020) (amended petition for original action granted on October 16, 2019).

6

and instead bar WSBU's action pursuant to the doctrine of laches. Before this term, this court has addressed the governor's constitutional authority to veto parts of appropriations bills in eight decisions; none involved consideration of a laches defense. All but one of these cases were filed within a few months of the vetoes going into effect.[6]

---

[6] See State ex rel. Wis. Tel. Co. v. Henry, 218 Wis. 302, 260 N.W 486 (1935) (vetoes of emergency relief budget bill, ch. 15, Laws of 1935, published on March 27, 1935, challenge filed on April 2, 1935); State ex rel. Finnegan v. Dammann, 220 Wis. 143, 264 N.W 622 (1936) (vetoes of provisions regulating motor carriers, ch. 546, Laws of 1935, published on October 4, 1935, challenge decided by court on January 7, 1936); State ex rel. Martin v. Zimmerman, 233 Wis. 442, 289 N.W 662 (1940) (vetoes of public welfare appropriations bill, ch. 533, Laws of 1939, published on November 18, 1939, challenge filed on December 2, 1939); State ex rel. Sundby v. Adamany, 71 Wis. 2d 118, 237 N.W.2d 910 (1976) (vetoes of 1975-77 biennial budget bill, ch. 39, Laws of 1975, published on July 30, 1975, oral argument held on December 2, 1975); State ex rel. Kleczka v. Conta, 82 Wis. 2d 679, 264 N.W.2d 539 (1978) (vetoes of provisions regarding public financing of election campaigns, ch. 107, Laws of 1977, published on October 20, 1977, challenge filed on December 2, 1977); State ex rel. Wis. Senate v. Thompson, 144 Wis. 2d 429, 424 N.W.2d 385 (1988) (vetoes of 1987-89 biennial budget bill, 1987 Wis. Act 27, published on July 31, 1987, oral argument held on October 20, 1987); Citizens Util. Bd. v. Klauser (CUB), 194 Wis. 2d 484, 534 N.W.2d 608 (1995) (veto of 1993-95 biennial budget bill, 1993 Wis. Act 16, published on August 11, 1993, challenge filed on June 13, 1994); Risser v. Klauser, 207 Wis. 2d 176, 558 N.W.2d 108 (1997) (vetoes of transportation budget bill, 1995 Wis. Act 113, published on December 20, 1995, challenge filed on January 4, 1996).

And the lone outlier was filed within a year, well before a new budget bill was even proposed.[7]

## A. Laches Generally

¶11 Laches is an affirmative, equitable defense designed to bar relief when a claimant's failure to promptly bring a claim causes prejudice to the party having to defend against that claim. Sawyer v. Midelfort, 227 Wis. 2d 124, 159, 595 N.W.2d 423 (1999). While formulated differently across cases and jurisdictions, the laches doctrine is broadly understood to ask whether a party delayed without good reason in raising a claim, and whether that delay prejudiced the party seeking to defend against that claim. See State ex rel. Wren v. Richardson, 2019 WI 110, ¶14, 389 Wis. 2d 516, 936 N.W.2d 587 (explaining that laches "is founded on the notion that equity aids the vigilant, and not those who sleep on their rights to the detriment of the opposing party" (quoted source omitted)).

¶12 In Wisconsin, application of laches is premised on proof of three elements: (1) a party unreasonably delays in bringing a claim; (2) a second party lacks knowledge that the

---

[7] The partial veto challenge in CUB was filed ten months after the vetoed biennial budget bill went into effect. See 194 Wis. 2d at 487-89. While initiated later than the other veto cases, this original action was still filed more than eight months before a new biennial budget was proposed by the governor and more than thirteen months before a new biennial budget bill was published. See S. Journal, 92d. Reg. Sess., at 73-79 (governor's 1995-97 biennial budget message delivered to the legislature on February 14, 1995); 1995 Wis. Act 27 (published on July 28, 1995).

first party would raise that claim; and (3) the second party is prejudiced by the delay. Id., ¶15. The party seeking application of laches bears the burden of proving each element. Id. Whether that burden is carried is a question of law. Id., ¶16. Even if all three elements are satisfied, application of laches is left to the sound discretion of the court asked to apply this equitable bar. Id., ¶15.

## B. Laches Applied Here

¶13 The parties dispute all three elements, and contend that we should exercise our discretion in their favor. We consider each of these matters in turn.

## 1. Unreasonable Delay

¶14 The first element requires the respondents to prove WSBU unreasonably delayed in bringing the suit. What constitutes a reasonable time will vary and depends on the facts of a particular case. Foote v. Harrison, 137 Wis. 588, 590, 119 N.W. 291 (1909) (quoting Rogers v. Van Nortwick, 87 Wis. 414, 429, 58 N.W. 762 (1894)); see also Wren, 389 Wis. 2d 516, ¶18 ("Whether a delay is reasonable is case specific; we look at the totality of circumstances." (citation omitted)).

¶15 There can be no dispute that WSBU's claim became actionable on September 23, 2017, the day 2017 Wis. Act 59 went into effect. At that point, the underlying facts of the original action were set. This is true even though the legislature could have subsequently overridden the disputed

9

vetoes. It is the governor's procedural use of the vetoes, not the substance of the underlying laws, that is at the heart of WSBU's challenge. Notwithstanding, WSBU did not file its original action until October 28, 2019, well after the applicable biennium had closed and nearly four months after the new biennial budget had gone into effect.

¶16 WSBU does not contest these basic facts. Instead, it observes that other types of actions are governed by statutes of limitation longer than the time period at issue here, and argues the effect of these partial vetoes will be with us for years (decades in one instance, and a millennium in the other). This is true, but does not demonstrate that its delay was reasonable. Laches is an equitable doctrine, and therefore can and regularly does apply even before a statute of limitation has expired. See Wren, 389 Wis. 2d 516, ¶13 n.8 (explaining Wisconsin jurisprudence has long recognized laches as an equitable defense that operates "independently of any statute of limitations" (quoting Sheldon v. Rockwell, 9 Wis. 158 (*166), 162 (*181) (1859))); Zizzo v. Lakeside Steel & Mfg. Co., 2008 WI App 69, ¶7, 312 Wis. 2d 463, 752 N.W.2d 889 ("Laches is distinct from a statute of limitations and may be found where the statute of limitations has not yet run."). Moreover, it would be quite normal for partial vetoes to have a dramatic effect. Many a legislative proposal has been irrevocably altered by a governor's partial veto pen.

¶17 Where a litigant challenges the process by which a bill becomes a law—indeed whether it should even be treated as a

10

law at all—a reasonably prompt lawsuit is and should be the norm. See, e.g., State ex rel. Ozanne v. Fitzgerald, 2011 WI 43, ¶¶29, 36, 334 Wis. 2d 70, 798 N.W.2d 436 (Prosser, J., concurring) (bill signed by the governor on March 11, 2011, constitutional challenge to the bill's procedural enactment filed on March 16, 2011). This is far different than a challenge to the substantive validity of a law, where such lawsuits may not even ripen until enforcement begins. See Schaeffer v. Anne Arundel Cty., 656 A.2d 751, 753-55 (Md. 1995) (distinguishing substantive objections to statutes from belated challenges to their procedural enactment for purposes of laches); Stilp v. Hafer, 718 A.2d 290, 293-94 (Pa. 1998) (finding lack of due diligence in pursuing procedural challenge given relevant legislative record and constitutional provisions publicly available at the time of the law's enactment).[8]  Here, as we discuss more fully below, money has been spent, revenues have come in, and the books have already been closed on the operation of the 2017-19 biennial budget. Cf. Schulz v. State, 615 N.E.2d 953, 957 (N.Y. 1993) (finding an 11-month delay unreasonable in constitutional challenge brought against the

_____

[8] WSBU's reliance on a case rejecting a laches defense against a constitutional challenge to the substance of a law is misplaced given it is attacking the process by which Act 59, §§ 1641m and 2265 were enacted, not the substance of those provisions. Cf. Cathcart v. Meyer, 88 P.3d 1050, 1058-59 (Wyo. 2004) (rejecting laches defense against a challenge to a term-limit initiative based on the constitutionality of its substance, explaining there was no showing of particularized prejudice and contrasting with a case based on a procedural constitutional attack, not a substantive one).

11

procedural enactment of public financing laws). Waiting years after a budget bill has gone into effect to challenge whether it was constitutionally enacted in the first place is too long. See id. ("[F]iscal year 1990-1991 has come and gone and its financial books in this respect have been closed. Equitable considerations of time, in the laches sense, may justifiably keep them closed . . . ."). Giving a stamp of approval to delayed litigation raising procedural challenges like the proper exercise of a partial veto would invite lawsuits over budgets of yesteryear and disrupt the status quo. There must be a limit to when a lawsuit like this may be filed. We conclude the challenge here, brought well after the previous biennium had passed, and after a new budget based on current law and future projections had taken effect, constitutes unreasonable delay.[9]

### 2. Lack of Knowledge

¶18 We also determine the respondents lacked knowledge of WSBU's forthcoming claim. The respondents assert they remained unaware of any potential claim until this original action was filed, an assertion WSBU does not deny or further dispute. WSBU still contends, however, that the respondents "certainly could have anticipated that someone might challenge vetoes with such prolonged consequences." That's possible, but only in the sense

---

[9] The respondents argue for a firm cutoff at the end of the biennium for these kinds of challenges. However, laches is always case-specific, and we need not establish such a rule to conclude that the delay under these circumstances was too long.

12

that every partial veto could one day become a litigated matter. Based on the undisputed record before us, the respondents here had no advance knowledge or warning of this particular claim. That is sufficient to satisfy this element of a laches defense.[10]

### 3. Prejudice

¶19 The final element of laches requires proof of prejudice resulting from the claimant's unreasonable delay. "What amounts to prejudice . . . depends upon the facts and circumstances of each case, but it is generally held to be anything that places the party in a less favorable position." Wren, 389 Wis. 2d 516, ¶32.

¶20 The respondents argue that, given their roles in the state budget-making process, WSBU's delay places them in a less favorable position with regard to the planning and management of state receipts and expenditures. The respondents' claim is specifically grounded in a prejudicial change to their position regarding the 2019-21 budget (i.e., the state's current budget). Collectively, this describes a form of prejudice that we have called economic prejudice. See id., ¶33 & n.26 (distinguishing economic and evidentiary prejudice); 27A Am. Jur. 2d Equity

---

[10] See Schafer v. Wegner, 78 Wis. 2d 127, 133, 254 N.W.2d 193 (1977) (concluding party asserting laches defense lacked knowledge of claim given that claim had not been raised in a reasonable time); cf. Watkins v. Milwaukee Cty. Civil Serv. Comm'n, 88 Wis. 2d 411, 422-23, 276 N.W.2d 775 (1979) (noting the petitioner informed the respondent at the time of his resignation that litigation would be commenced if a corresponding hearing was not held).

13

§ 144 (discussing types of prejudice including economic prejudice caused by a change in a responding party's position).

¶21 Broadly speaking, every new budget bill is created with an understanding that earlier budgets, including any provisions bearing marks of former vetoes, will serve as a foundation. At the direction of the governor, the respondents and other executive branch officers hold this understanding when they create department budgets and ready all of the other fiscal information that must be included in a biennial budget report.[11] The governor then carries the same understanding when creating his proposed budget and when signing the legislature's proposed budget into law. See Champagne, supra, at 1 (describing the state budget bill as Wisconsin's most significant piece of legislation in part because "it contains most of the governor's public policy agenda for the entire legislative session").

¶22 Turning to the making of the 2019-21 budget, if the challenged vetoes from the outgoing budget are removed from the picture, as WSBU now pleads, there would have been cascading

---

[11] The respondents, while acting in their official capacities, each direct and supervise a department within the executive branch structure. See Wis. Stat. § 15.10 (department of administration); Wis. Stat. § 15.37 (department of public instruction); Wis. Stat. § 15.43 (department of revenue). In these roles, they all have various duties related to the state budget-making process. See, e.g., Wis. Stat. § 15.04(1)(b) (requiring from each department a biennial compilation of a comprehensive program budget); Wis. Stat. §§ 16.43 and 16.46 (requiring the secretary of administration to prepare the biennial state budget report); Wis. Stat. § 16.46(8) (requiring the department of revenue to report on estimated state revenues for inclusion in the budget report).

14

effects on the state's global policy calculus and budget outlook, as well as options available to policymakers. For instance, eliminating the moratorium on the school district revenue-limit adjustment in Act 59, § 1641m could have led to property tax increases in school districts across the state. Even a change like this adjusts how the state's policy puzzle fits together. With potentially higher property taxes, the respondents could have chosen to offer various offsetting property tax relief measures. Maybe different revenue limits would have been proposed. Maybe school district spending priorities would have been altered by the incentive in a way that would have changed their funding requests during the new biennium. Likewise, according to the respondents' calculations, putting 2013 Wis. Act 229 into effect by undoing the partial veto in Act 59, § 2265 could have caused an annual decline of more than $10 million in sales-and-use tax revenue. This is a significant adjustment to the state balance sheet. To compensate, policymakers could have enacted a tax increase to make up for lost revenue. Or maybe they would have chosen to spend $10 million less per year on some other state program or priority.

¶23 WSBU responds that the financial footprint of these budgetary programs was a "microscopic fraction" of the total appropriations for the 2019-21 biennium. We disagree that $20 million is mere change in the state's coffers. While this amount of specific tax revenue seems small in comparison to the state's total revenues over the course of a biennium, it is

15

still a significant sum. The state's budget reserve provides a clear example of why this is so. The reserve, which is premised on projections of revenues and expenditures, acts as a budget stabilization mechanism in times of fiscal uncertainty.[12] In fact, state law imposes a mandatory reserve floor. Wis. Stat. § 20.003(4). For the 2019-21 budget, the state was required to maintain a reserve of at least $80 million and $85 million in the two fiscal years. See § 20.003(4)(L). Two years of $10 million in tax revenue is almost a quarter of the reserve required for the entire biennium.

¶24 Even so, the point of this discussion is not the specific amount of revenue loss or a definitive statement regarding what would have happened. The point is that unreasonable delay cost the respondents the opportunity to account for those changes in the development and passage of the 2019-21 biennial budget. The alternatives are not "pure speculation" as WSBU alleges. These examples show that the 2019-21 budget paid for and relied upon decisions the partial vetoes solidified into law more than two years earlier.

¶25 In short, the provisions of a biennial budget are hardly something that can be examined in isolation. Budget bills are complex and dynamic creatures, and each individual figure and measure incorporated within the enacted law plays a

---

[12] See generally Christa Pugh, Legislative Fiscal Bureau, Budget Stabilization Fund and General Reserve Fund Requirements (2019) (outlining the design and purposes of Wisconsin's budget reserve).

16

part in an interconnected network of complementary policy choices. WSBU's delay in seeking to reverse decisions from the 2017-19 biennium deprived the respondents of the opportunity to take an altered policy foundation into account in subsequent choices. For this, the respondents are surely placed "in a less favorable position." Wren, 389 Wis. 2d 516, ¶32. And that constitutes prejudice.[13]

### 4. Discretion

¶26 The respondents have proved all three elements of laches are met in this case. Even so, application of laches is within our equitable discretion. See id., ¶15 (explaining a court may choose not to apply laches "if it determines that application of the defense is not appropriate and equitable"). We conclude equity weighs strongly in favor of applying laches here.

¶27 We have already covered the specific prejudicial effect to the respondents. This by itself is weighty. But in addition, every new budget generates substantial reliance

---

[13] As part of their prejudice argument, the respondents emphasize that the challenged vetoes were made by a previous gubernatorial administration. All of the respondents have been sued in their official capacity, which means the individual occupant of any given position is irrelevant to the broader prejudice argument. The prejudice to the official functions of the named respondents is the same regardless of whether their priorities or policy views may be different. In any event, the respondents have shown they will be prejudiced regardless of whether there was an intervening change in the governor's office.

17

interests on behalf of both public and private parties across the state. The same cascading effects of even modest changes to a broader policy framework are true not just within the biennial budget itself, but for the budgets and outlook of counties, municipalities, school districts, nonprofit organizations, colleges, road contractors, health care systems, and innumerable other public and private actors.[14]

¶28 Part of this is the reasonable presumption that enacted laws, especially budget bills, can be relied upon to order one's affairs. The respondents make this point in reference to our recent decision in Winebow, Inc. v. Capitol-Husting Co., which turned in part on the effect of partial vetoes in the 1999-2001 budget. 2018 WI 60, ¶¶12-22, 381 Wis. 2d 732, 914 N.W.2d 631 (discussing 1999 Wis. Act 9, § 2166m and § 2166s). There, on a certified question from the Seventh Circuit, we determined whether a wine grantor-dealer relationship satisfied the definition of a dealership in the Wisconsin Fair Dealership Law. Id., ¶1. Underlying that question, the parties each pointed to a different statutory provision as containing the dispositive answer. See id., ¶¶23,

---

[14] See also 30A C.J.S. Equity § 155 ("The defense of laches is applied with even greater force when delay in attacking the legality of the collection and spending of public moneys will result in grave public injury were the relief sought to be granted."); 27A Am. Jur. 2d Equity § 145 ("The court may look at the disruptive effect a plaintiff's relief would have on other parties in determining whether laches applies to the claim. Thus, laches is particularly justified where the plaintiff's delay in pursuing a claim would have a catastrophic effect on the rights of many third parties." (footnote omitted)).

25 (citing Wis. Stat. §§ 135.02(3)(b), 135.066 (2015-16)). To provide background, we unpacked the provisions' relevant statutory history, which included partial vetoes from nearly two decades earlier. Id., ¶¶12-22. In answering the certified question, we did not address the constitutionality of those vetoes. But if we had done so and ruled that they were beyond the governor's constitutional authority, Wisconsin's commercial wine industry could have been radically upended given statewide reliance interests on a 19-year-old partial veto that was newly determined invalid.

¶29 Other jurisdictions have similarly barred untimely challenges to alleged procedural deficiencies in the enactment of a law. In so doing, these courts acknowledge the broader and more pervasive prejudicial effects resulting from belatedly undoing statutory enactments. See, e.g., Schaeffer, 656 A.2d at 753, 755 (emphasizing prejudice that would be caused to hundreds of county employees who relied on pension plan modifications effected by an ordinance subject to belated procedural challenge); Cole v. State ex rel. Brown, 42 P.3d 760, 764 (Mont. 2002) (identifying prejudice of former officeholders and potential candidates who relied on presumptively valid

constitutional term-limit initiative subject to belated procedural challenge).[15]

---

[15] The New York Court of Appeals decision in Schulz v. State appears to provide a particularly fitting comparison to this case. There, the court held laches should apply against a procedural challenge to various public financing laws that had been enacted 11 months earlier. 615 N.E.2d 953, 957-58 (N.Y. 1993). In the intervening period, significant financial activity was conducted in reliance on the statues. Id. Thus, amongst the "profound destabilizing and prejudicial effects from delay" that could affect the state in its "operation and maintenance of orderly government," the New York court explained:

> Appellants' demand for relief on the merits of their constitutional challenge would have the bonds recalled and refunded and the nonbond transactions nullified. Metaphorically, the impossibility of putting genies back in their bottles springs to the imagination. Realistically, constitutional challenges to public financing of such massive and profound dimension, possibly causing traumatic disturbance to settled matters of public finances and governance, should be undertaken reasonably promptly. To relax this procedural safeguard could disproportionately incur or threaten a greater harm to the public weal than the alleged constitutional transgression itself. Undoing such closed financial transactions would also add hundreds of millions of dollars of unplanned expenditures to the taxpayers' burdens. In sum, fiscal year 1990–1991 has come and gone and its financial books in this respect have been closed. Equitable considerations of time, in the laches sense, may justifiably keep them closed and do not warrant, in the circumstances presented here, a piecemeal invalidation challenge as suggested . . . .

Id. (citation omitted).

¶30 Orderly state governance is premised in no small part on the stability and certainty of state finances. Nowhere are those principles needed more than in the state's biennial budget. Each budget bill is a massive undertaking that is meant to fully encapsulate the financing of the state's operations and programs over the next two years. Our state is, to a very large degree, publicly and privately ordered around that single piece of legislation. Judicial disturbance of biennial budgets past would be incredibly disruptive to the public and private affairs of many whose livelihoods are tied to public policy (which is to say, almost everyone).

¶31 It is true that the proper interpretation of the governor's partial veto powers is an important question. But that alone, in our view, does not counsel undoing the current policy framework that was crafted in reliance on the policy choices settled in the previous biennium. This court has considered cases arising from the governor's veto authority before; we will surely do so again. But it is crucial that claims of this sort are brought in a timely manner. Because this claim was not, application of laches in this case is equitable and appropriate.

---

WSBU's citation to another New York case that distinguished itself from Schulz simply shows that laches is a fact-specific defense. Cf. Saratoga Cty. Chamber of Commerce, Inc. v. Pataki, 798 N.E.2d 1047, 1056-57 (N.Y. 2003) (rejecting laches defense against a challenge to a gaming compact because, in contrast to Schulz, there was no showing that delay caused economic prejudice given the casino's operations had never been interrupted).

## III.   CONCLUSION

¶32  WSBU challenges two partial vetoes in the biennial budget enacted in September 2017.  But WSBU waited until October 2019 to file this action.  The 2017-19 biennium has closed, and a new biennial budget has since been enacted relying in part on the law enacted in 2017.  The respondents have established the elements of laches and demonstrated that application of the equitable doctrine is appropriate here.  Accordingly, we dismiss WSBU's original action.

*By the Court.*-Relief denied.

¶33 REBECCA GRASSL BRADLEY, J. *(dissenting).* In resolving this dispute over the scope of the governor's veto power, the Wisconsin Supreme Court should have consulted the Wisconsin Constitution, under which "all governmental power derives 'from the consent of the governed' and government officials may act only within the confines of the authority the people give them. Wis. Const. art. I, § 1." Wis. Legislature v. Palm, 2020 WI 42, ¶66, 391 Wis. 2d 497, 942 N.W.2d 900 (Rebecca Grassl Bradley, J., concurring). Instead, the majority latches on to laches, an equitable doctrine that operates not as a jurisprudential command, but merely as a discretionary option for avoiding a decision on the merits. The text of the constitution does not support the exercise of either veto challenged in this case and the court should have so declared. "Whenever any branch of government exceeds the boundaries of authority conferred by the people, it is the duty of the judicial branch to say so." Id.

¶34 Under the Wisconsin Constitution, all bills must originate in the legislature, and only the legislature may amend them. Wis. Const. art. IV, § 19.[1] In the exercise of his veto power, the governor may approve or reject an appropriation bill, in whole or in part, and the approved part then becomes law.

---

[1] Wisconsin Constitution, Article IV, Section 19 provides:

Any bill may originate in either house of the legislature, and a bill passed by one house may be amended by the other.

1

Wis. Const. art. V, § 10(1)(b).[2]  With respect to each of the bills at issue in this case, the legislature delayed the effective date of a law, not a bill, by one year; in exercising his "veto," the governor delayed their effective dates by 1000 years and 60 years, respectively, effectively nullifying each law.  The constitution does not confer on the governor any authority to amend or otherwise rewrite a bill in this manner, much less abolish laws altogether.

¶35 The governor's vetoes invaded the exclusive province of the legislature by amending the effective dates of laws previously passed by the legislature and approved by the governor, effectively erasing these laws from the books.  The people of Wisconsin never gave the governor this power.  Nonetheless, it is not at all surprising that many governors have exceeded the veto authority the constitution accords them, because this court has repeatedly "dress[ed] up the governor as the people's legislative agent (with respect to appropriations bills)" in utter disregard for what the constitution actually says.  Bartlett v. Evers, 2019AP1376-OA, slip op., ¶173 (Wis. S. Ct. July 10, 2020) (Kelly, J., concurring in part; dissenting in

---

[2] Wisconsin Constitution, Article V, Section 10(1)(b) provides, in relevant part:

> Appropriation bills may be approved in whole or in part by the governor, and the part approved shall become law.

2

part).[3] Although this court's repeated and erroneous broadening of the veto authority invariably contravenes the constitution's separation of powers, even this court's atextual interpretations of the veto power have never permitted a governor's repeal of duly enacted law. Nor has this court ever ducked the merits altogether after granting an original action petition to decide whether a governor's veto violated the constitution. Until now.

¶36 Without any precedent to support its sidestepping, the court declines to answer the constitutional question it had agreed to decide. Instead, it makes the unprecedented move of disposing of this case under the doctrine of laches, declaring the petitioners filed this action a couple months too late to warrant a substantive analysis, under a new rule the majority just made up. The majority shirks its responsibility to decide a fundamental issue of constitutional law. I respectfully dissent.

I. BACKGROUND

¶37 This case arises from Governor Scott Walker's vetoes within the 2017-19 budget bill, namely Section 1641m and Section 2265. Section 1641m affected Wis. Stat. § 121.91(4)(o), the

---

[3] Justice Daniel Kelly's concurrence/dissent in Bartlett v. Evers, 2019AP1376-OA, slip op. (Wis. S. Ct. July 10, 2020), thoroughly explores this court's partial veto jurisprudence and how it conflicts with the text of the constitution. In that opinion, Justice Kelly also explains the mechanism provided by the Wisconsin Constitution for the enactment of laws, as well as the original meaning of the provisions permitting a governor to approve an appropriation bill "in part." See id. (Kelly, J., concurring in part; dissenting in part). I will not repeat that analysis in this opinion, but refer the reader to Justice Kelly's opinion in Bartlett.

3

statute allowing a school district to exceed revenue limits if it "implement[s] energy efficiency measures or" "purchase[s] energy efficiency products." Id. This has been the law since 2009. See Wis. Stat. § 121.91(4)(o) (2009-10). The legislature decided to impose a moratorium on the "Energy Efficiency Revenue Limit Adjustment" for the calendar year 2018. The legislature's one-year moratorium was drafted by adding subdivision 4 to already-existing Wis. Stat. § 121.91(4)(o). Subdivision 4 provided: "Unless the resolution is adopted before January 1, 2018, subd. 1. applies only to a resolution adopted after December 31, 2018." The governor struck "1, 2" from the "December 31, 2018" date to change the one-year pause of the Energy Efficiency Adjustment into a millennium moratorium (1,000 years) extending until December 3018.

¶38 Section 2265 modified Wis. Stat. § 77.585, a statute affording retailers the ability to obtain a refund of sales tax paid to the State for the uncollectible amount of customer purchases made using retailer-issued credit cards that become "bad debt" as defined in the statute. In 2013, the legislature amended § 77.585 to allow refunds of sales taxes paid by a retailer for the uncollectible amount of purchases made by customers using credit cards (like Visa or Mastercard) issued by third party lenders who partner with the retailer. When this bill was enacted into law, the legislature initially delayed the effective date to July 1, 2015, subsequently to July 1, 2017, and later to July 1, 2018. The "Private Label Credit Card Bad Debt Deduction" amendments would have taken effect on July 1,

4

2018, but for the governor's use of his veto power to change the effective date to July 1, 2078, thereby delaying the implementation of the statute for 60 years.

¶39 After executing his vetoes, the governor approved the 2017-19 budget bill, which became 2017 Wisconsin Act 59 and was published on September 22, 2017. The partial veto review was placed on the Assembly calendar for May 8, 2018 as part of the veto review session pursuant to Joint Rule 82(2)(a),[4] but the Assembly did not act to override the governor's vetoes. See State of Wis. Assemb. J., May 8, 2018, at 943.

¶40 On July 4, 2019, the 2019-21 biennial budget went into effect. On October 28, 2019, WSBU filed a petition with this court seeking to initiate an original action challenging two of the governor's vetoes within the 2017-19 budget. WSBU asked the court to answer the following question: "May the Governor, pursuant to his constitutional authority under art. V, sec. 10 of the Wisconsin Constitution, as amended in 1990, reject individual parts of a date contained in an enrolled bill so as to create a new date that was never approved by the Legislature?" The court issued an order requiring the named respondents to file a response to the petition, which the Attorney General subsequently submitted to the court on December 6, 2019 on behalf of the respondents.

¶41 The Attorney General's response raised concerns with the timing of WSBU's petition and requested the court deny the

---

[4] See Wis. Jt. Rules of Senate and Assembly § 82 ("Veto review session, even numbered year.").

5

petition on that basis. Emphasizing that WSBU filed the petition after the 2017-19 biennium ended, the Attorney General asserted that "Petitioners have not acted promptly" and "[t]heir petition comes two years after Act 59 was published . . . and more than three months after the successive biennial budget bill was signed into law." The Attorney General advised the court that the "timing of Petitioners' petition is in stark contrast to prior lawsuits challenging governors' partial veto authority"——noting other lawsuits contesting budget vetoes "were challenged promptly, within the same budget biennium."

¶42 Despite knowing WSBU filed its petition after the 2017-19 budget time period, this court granted the petitioners' request for this original action on the issue of whether Governor Walker exceeded his authority when he used his veto power to change the effective dates of two laws in the 2017-19 biennial budget bill. The court's order asked the parties to file briefs, and the court held oral argument in April 2020.

## II. ORIGINAL ACTIONS & CRITERIA FOR REVIEW

¶43 Article VII, Section 3 of the Wisconsin Constitution confers jurisdiction on this court to hear "original actions and proceedings." Wis. Const. art. VII, § 3(2). Original action petitions are relatively rare and the court grants one only if four or more justices vote to take the case. Wis. S. Ct. IOP III (Sept. 13, 2019). Even before the vote, the respondents file a response brief, as they did in this case. Wis. S. Ct. IOP III (Sept. 13, 2019). The court then decides whether to grant the petition, having had the benefit of hearing from both

6

sides. "When a matter is brought to the Supreme Court for review, the court's principal criterion in granting or denying review is not whether the matter was correctly decided or justice done in the lower court, but whether the matter is one that should trigger the institutional responsibilities of the Supreme Court." Wis. S. Ct. IOP III (Sept. 13, 2019). "The same determination governs the exercise of the court's original jurisdiction." Wis. S. Ct. IOP III (Sept. 13, 2019).

¶44 Wisconsin Stat. § 809.62(1r) enumerates "criteria for granting review" and provides in pertinent part:

> Supreme court review is a matter of judicial discretion, not of right, and will be granted only when special and important reasons are presented. The following, while neither controlling nor fully measuring the court's discretion, indicate criteria that will be considered:
>
> (a) A real and significant question of federal or state constitutional law is presented.
>
> (b) The petition for review demonstrates a need for the supreme court to consider establishing, implementing or changing a policy within its authority.
>
> (c) A decision by the supreme court will help develop, clarify or harmonize the law, and
>
> 1. The case calls for the application of a new doctrine rather than merely the application of well-settled principles to the factual situation; or
>
> 2. The question presented is a novel one, the resolution of which will have statewide impact; or
>
> 3. The question presented is not factual in nature but rather is a question of law of the type that is likely to recur unless resolved by the supreme court.

Determining whether a governor exceeded his constitutional veto authority in effectively repealing laws by changing their effective dates unquestionably triggers the institutional responsibility of this court. At least four justices agreed and voted to grant the petitioners' original action petition.

### III. THE MAJORITY'S REFUSAL TO DECIDE THE MERITS

¶45 The majority declines to decide the constitutionality of Governor Walker's vetoes, a significant issue of statewide importance that at least four members of this court agreed should be resolved. Instead, the majority denies relief based on the equitable doctrine of laches, which by its very nature rests within the discretion of the court to apply——or not. Although in a footnote the majority denies it,[5] the majority's opinion establishes a rule barring challenges to a governor's vetoes unless filed within the biennium in which the vetoes occurred. The majority concludes that because WSBU brought its

---

[5] Majority op., ¶17 n.9. The majority's opinion focuses entirely on the untimeliness of WSBU's action based on its filing after the relevant biennium had passed and a new biennium was underway. Nevertheless, the majority denies establishing any laches rule with respect to veto challenges, emphasizing it is merely concluding WSBU waited "too long" "under these circumstances." Id. In other words, the majority knows it when it sees it, but it's not disclosing "it." If the majority isn't establishing a laches rule (which would be helpful) and isn't resolving the substantive issue it said it would decide (which leaves an important question unanswered), then why did the court take this case? If the court is declaring merely that under these specific facts, laches applies, then the court could have (and should have) simply denied the petition. Instead, the majority releases an opinion providing no answer to the question granted and establishing no precedent. Future litigants will have no idea how late is "too late" because the majority offers nothing to guide them. So much for the rule of law.

challenge a few months after the 2017-19 biennium ended, the action is too late. The majority embraces this novel laches argument (to which the Attorney General devoted a mere 6 pages of his 47-page brief) even though laches was not an issue presented in the petition.

¶46 The majority denies WSBU relief based on the laches doctrine even though this court has never applied laches in an original action challenging the constitutionality of a governor's veto——giving WSBU no notice or warning that its veto challenge would be denied without answering the substantive question upon which this court granted WSBU's petition. The court employs laches as a mechanism to avoid deciding a fundamental question of constitutional law and leaves these petitioners in the dark. The people of Wisconsin will never know whether these vetoes comport with or violate the constitution. Nor will current or future governors or legislatures, unless and until the court decides to resolve this issue——perhaps in 60 or 1,000 years.

¶47 The majority concludes that the Attorney General satisfied his burden of proving all of the elements of laches. I disagree.[6] Even if the elements of laches were satisfied, I

_____

[6] The majority's questionable analysis of laches is unprecedented in resolving an original action challenging a governor's veto. First, the majority concludes that WSBU could have challenged these vetoes as early as September 23, 2017——the effective date of the 2017-19 budget bill. Its presumption ignores the time period allowed for a legislative override, which did not expire until May 8, 2018. The Joint Rules of the Wisconsin Senate and Assembly provide that "[t]he biennial session schedule shall provide for a veto review session" between April 1 and June 30 of even-numbered years that would include gubernatorial vetoes or partial vetoes. See State of

9

Wis. Jt. Rules of Senate and Assembly § 82(1) & (1m)(a). The partial vetoes in this case were calendared and then sustained on May 8, 2018, because the legislature did not act to override them. <u>See</u> Adverse Disposal, State of Wis. Assemb. J., May 8, 2018, at 943, https://docs.legis.wisconsin.gov/2017/related/journals/assembly/ 20180508.pdf. Citing nothing but cases from foreign jurisdictions, the majority perfunctorily concludes WSBU waited "too long" and "[t]here must be a limit to when a lawsuit like this may be filed," although it refuses to announce what that limit is. Majority op., ¶17. Of course, no Wisconsin law specifies a limit, and the one the majority invents apparently applies only under the circumstances in this particular case. Worse yet, the majority imposes its amorphous time limit retroactively on WSBU, who could not have foreseen its action would be time-barred.

Second, "[w]hether the doctrine of laches applies is fact specific." <u>Riegleman v. Krieg</u>, 2004 WI App 85, ¶22, 271 Wis. 2d 798, 679 N.W.2d 857. The existence of disputed facts would preclude the application of laches, but the majority pretends none exist. The majority summarily concludes the respondents lacked knowledge of WSBU's forthcoming claim based solely on the respondents saying so and "[b]ased on the undisputed record before us." Majority op., ¶18. WSBU was never afforded the opportunity to refute the assertion and there is no "record" before us because this is an original action in which no factual development occurred. Nevertheless, the majority concludes the respondents proved the "lack of knowledge" element of laches despite the absence of any evidentiary or testimonial evidence to support it.

Finally, the majority's analysis of the doctrine's prejudice prong details a number of speculative, alternative actions the State might have taken if the claim against the budget vetoes were brought earlier:

- "Maybe different revenue limits would have been proposed."

- "Maybe school district spending priorities would have been altered by the incentive in a way that would have changed their funding requests during the new biennium."

- "[M]aybe they would have chosen to spend $10 million less per year on some other state program or priority."

10

would not apply the doctrine. A constitutional challenge to the power of the governor, particularly as it implicates the separation of powers, takes precedence over all other considerations, including the economic consequences of invalidating a governor's veto (which relate to the remedy rather than the merits). The powers constitutionally assigned to the legislative branch "must be kept forever separate" from those assigned to the executive branch "because, as Madison once observed, '[t]here can be no liberty where the legislative and executive powers are united in the same person, or body of magistrates.' The Federalist No. 47, at 299 (James Madison) (Clinton Rossiter ed., 1961)." Palm, 391 Wis. 2d 497, ¶92 (Kelly, J., concurring). "[O]ur duty to ensure the lines do not cross is mandatory and non-discretionary." Id. Regardless, the reasoning underlying the majority's application of laches is fundamentally unsound. The same economic consequences the majority invokes to justify its application of laches would exist if WSBU had filed this action on July 3, 2019——one day before the 2019-21 biennium began, and therefore presumably timely under the majority's new case-specific laches rule. Given the importance of the issue presented in this original action and this court's choice to take the case, the majority should have addressed the merits. See Zizzo v. Lakeside Steel & Mfg. Co., 2008 WI App 69, ¶6 n.3, 312 Wis. 2d 463, 752 N.W.2d 889 (Even if a court "find[s] all the elements of laches

---

Majority op., ¶22. However likely those actions would have been, the court cannot cite anything to prove any form of prejudice actually occurred.

11

present, [it] may nevertheless exercise its discretion not to apply the doctrine.").

¶48 In applying laches, the majority credits the respondents' reliance on the budget but ignores WSBU's reliance on the state of the law when the court granted its single-issue petition. WSBU could not possibly have known that a challenge on October 28, 2019 to the 2017-19 budget was too late, given these circumstances:

- The court granted WSBU's petition solely on the issue requested: "May the Governor, pursuant to his constitutional authority under art. V, sec. 10 of the Wisconsin Constitution, as amended in 1990, reject individual parts of a date contained in an enrolled bill so as to create a new date that was never approved by the Legislature?"

- The court granted WSBU's original action petition knowing it was filed after the 2017-19 budget biennium had passed.

- The court has never granted an original action petition challenging a governor's veto and then declined to address the merits.

- There is no prior Wisconsin case declaring that laches will bar a veto challenge if the petition is filed four months beyond the biennium to which the challenge applies.

- The petitioner challenges "vetoes" that set effective dates 1,000 and 60 years into the future.

12

¶49 The court could have established its new laches rule barring post-biennium actions challenging gubernatorial vetoes at the same time it addressed the merits of the constitutional issue it agreed to decide in this case. The laches rule could have been applied prospectively and all future litigants would have fair warning that a veto challenge must be filed before the biennium expires. Instead, the court chose to blindside WSBU. Despite granting the petition, well-aware of its post-biennium timing, the court refuses to analyze whether the governor violated the constitution by employing his veto power to eliminate previously enacted law. The court reasons that the political branches relied on the 2017-19 budget in developing the 2019-21 budget bill and if the governor had known about the veto challenge before the enactment of the 2019-21 budget, he may have acted differently. This is an unjustifiable excuse to avoid deciding the fundamental question of constitutional law the court announced it would decide. Any impact on the 2019-21 budget could have been rectified through a budget repair bill under Wis. Stat. § 16.50(7) to address the effects of the court declaring the vetoes unconstitutional. The majority took an unprecedented and unwarranted "pass" on the issue it said it would decide, leaving WSBU, the people, and current and future governors and legislatures with a question that may never be answered. Even more troubling, the court leaves these unconstitutional vetoes unchecked and uncorrected——threatening the "tripartite separation of independent governmental power" that constitutes "the bedrock of the structure by which we

13

secure liberty." Gabler v. Crime Victims Rights Bd., 2017 WI 67, ¶3, 376 Wis. 2d 147, 897 N.W.2d 384.

## IV. THE WISCONSIN CONSTITUTION, SEPARATION OF POWERS, AND APPROPRIATION VETOES

¶50 Under Article IV, Section 1 of the Wisconsin Constitution, the people vested the legislative power in the senate and assembly: "The legislative power shall be vested in a senate and assembly." Wis. Const. art. IV, § 1. Under Article V, Section 10 (1)(a), "Every bill which shall have passed the legislature shall, before it becomes a law, be presented to the governor." Wis. Const. art. V, § 10(1)(a). With respect to a non-appropriation bill, the governor may approve and sign the bill, which then becomes a law. See Wis. Const. art. V, § 10(1)(b).[7] Alternatively, the governor may reject the bill and return it, along with his written objections, to the house in which the bill originated. See Wis. Const. art. V, § 10(2)(a).[8] The governor may approve "in whole

---

[7] Wisconsin Constitution, Article V, Section 10(1) provides:

(a) Every bill which shall have passed the legislature shall, before it becomes a law, be presented to the governor.

(b) If the governor approves and signs the bill, the bill shall become law. Appropriation bills may be approved in whole or in part by the governor, and the part approved shall become law.

(c) In approving an appropriation bill in part, the governor may not create a new word by rejecting individual letters in the words of the enrolled bill, and may not create a new sentence by combining parts of 2 or more sentences of the enrolled bill.

[8] Wisconsin Constitution, Article V, Section 10(2) provides:

14

or in part" any appropriation bill, "and the part approved shall become law." See Wis. Const. art. V, § 10(1)(b). Only a super majority of the legislature (two-thirds of the members present) may override the governor's veto of any bill. See Wis. Const. art. V, § 10(2)(a)-(b).

¶51 Under the Wisconsin Constitution, the governor may veto an appropriation bill, but only the legislature may amend it. The "powers of amending and vetoing are different things,

> (a) If the governor rejects the bill, the governor shall return the bill, together with the objections in writing, to the house in which the bill originated. The house of origin shall enter the objections at large upon the journal and proceed to reconsider the bill. If, after such reconsideration, two-thirds of the members present agree to pass the bill notwithstanding the objections of the governor, it shall be sent, together with the objections, to the other house, by which it shall likewise be reconsidered, and if approved by two-thirds of the members present it shall become law.
>
> (b) The rejected part of an appropriation bill, together with the governor's objections in writing, shall be returned to the house in which the bill originated. The house of origin shall enter the objections at large upon the journal and proceed to reconsider the rejected part of the appropriation bill. If, after such reconsideration, two-thirds of the members present agree to approve the rejected part notwithstanding the objections of the governor, it shall be sent, together with the objections, to the other house, by which it shall likewise be reconsidered, and if approved by two-thirds of the members present the rejected part shall become law.
>
> (c) In all such cases the votes of both houses shall be determined by ayes and noes, and the names of the members voting for or against passage of the bill or the rejected part of the bill notwithstanding the objections of the governor shall be entered on the journal of each house respectively.

15

the respective exercise of which our constitution commits to different branches of government." Bartlett, 2019AP1376-OA, slip op., ¶180 (Kelly, J., concurring in part; dissenting in part). The only clause in the constitution providing for amendment of a bill appears in Article IV, Section 19, which states: "Any bill may originate in either house of the legislature, and a bill passed by one house may be amended by the other." Wis. Const. art. IV, § 19. Accordingly, the governor can veto, but he cannot amend the law or create law. Bartlett, 2019AP1376-OA, slip op., ¶¶193-195 (Kelly, J., concurring in part; dissenting in part) ("Our constitution commits the power to amend to the assembly or senate; it contains no suggestion that the governor might be able to partake of it."). The constitution vests these powers in the legislature alone.

¶52 In establishing the Wisconsin Constitution, "[t]he people bestowed much power on the legislature, comprised of their representatives whom the people elect to make the laws." Gabler, 376 Wis. 2d 147, ¶60. As reflected in the constitutional text, "[t]he separation of powers 'operates in a general way to confine legislative powers to the legislature.'" League of Women Voters v. Evers, 2019 WI 75, ¶35, 387 Wis. 2d 511, 929 N.W.2d 209 (citing Goodland [v. Zimmerman], 243 Wis. [459] at 467, 10 N.W.2d 180). Accordingly, "an idea may not become a law without the legislature having voted for it." Bartlett, 2019AP1376-OA, slip op., ¶195 (Kelly, J., concurring in part; dissenting in part). Acting as a check on the

16

legislature, the governor may veto only the part of a presented bill that represents "an idea expressing a potential complete, entire, and workable law"——something on which the legislature voted and thereby approved. See id., ¶¶193, 195 (Kelly, J., concurring in part; dissenting in part). The constitution does not, however, give the governor the power to create an entirely different idea, and the constitution decidedly does not give the governor the ability to unilaterally enact a law of his own creation on which the legislature never voted and which it therefore never approved. See id., ¶195 (Kelly, J., concurring in part; dissenting in part).

¶53 Precluding one branch of government from intruding on the exclusive powers of another branch is fundamental to preserving the balance of governmental power, which is ultimately designed to protect the interests of the people the government was formed to serve. "To the Framers of the United States Constitution, the concentration of governmental power presented an extraordinary threat to individual liberty: 'The accumulation of all powers, legislative, executive, and judiciary, in the same hands, whether of one, a few, or many, . . . may justly be pronounced the very definition of tyranny.' The Federalist No. 47, at 298 (James Madison) (Clinton Rossiter ed., 1961) . . . . As Madison explained when advocating for the Constitution's adoption, neither the legislature nor the executive nor the judiciary 'ought to possess, directly or indirectly, an overruling influence over the others in the administration of their respective powers.'

17

Federalist No. 48, <u>id.</u> at 305 (James Madison)." <u>Gabler</u>, 376 Wis. 2d 147, ¶4. Joseph Story "'deemed [it] a maxim of vital importance'" that "'the three great powers of government . . . should for ever be kept separate and distinct.' 2 Joseph Story, <u>Commentaries on the Constitution of the United States</u> § 519, at 2-3 (Boston, Hilliard, Gray, & Co., 1833)." <u>Gabler</u>, 376 Wis. 2d 147, ¶3.

¶54 Although these legal principles are pertinent to the vetoes challenged in this case, it is important to recognize how this case differs from <u>Bartlett</u> and all other veto cases previously decided by this court. This case involves two unique factors. First, the governor used his veto to change provisions of laws already on the books——the vetoes were not confined to bills waiting to become laws, but instead disturbed previously enacted laws. Second, the vetoes effectively eliminated the laws entirely by extending their effective dates 1,000 years on one and 60 years on the other. The constitution's text restricts the governor's ability to reject the work of the legislature to bills and nowhere gives the governor the ability to repeal laws.

¶55 The veto power "furnishes an additional security <u>against the enaction of improper laws</u>. It establishes a salutary check upon the legislative body, calculated to guard the community against the effects of faction, precipitancy, or of any impulse unfriendly to the public good, which may happen to influence a majority of that body." Federalist No. 73, at 443 (Alexander Hamilton) (Clinton Rossiter ed., 1961) (emphasis

18

added).  As a general matter, the executive veto power may only prevent a bill from becoming a law; therefore, it may be exercised only against bills.  Nothing in the Wisconsin Constitution grants the governor the power to veto a law passed years earlier.  Even setting aside the effects of these vetoes on previously enacted laws, the vetoes nevertheless exceeded the governor's authority.  Under the Wisconsin Constitution, the governor's veto empowers him to negate, not create.

## V.  BOTH VETOES ARE UNCONSTITUTIONAL

¶56  WSBU challenges two vetoes executed by Governor Walker with respect to the 2017-19 biennium budget.  Both vetoes changed effective dates of laws that had been enacted in earlier, non-appropriation legislation.  Both vetoes involved bills previously passed by the legislature and signed by the governor into law.  At the time of their passage, the governor could have vetoed either bill.  He did not.  When the legislature later decided to delay the effective dates for each law, the governor struck digits in dates and a comma, merging what was left to create new dates never approved by the legislature and set so far into the future that the governor's actions essentially repealed two duly-enacted laws.  As explained below, neither veto "approved in whole or in part" something that became law, both vetoes struck something smaller than what constitutes a "part," and both vetoes left something on which the legislature never voted and which it therefore never approved.  Neither veto comported with the constitutional boundaries of the governor's authority.

19

A. The First Veto

¶57 The first veto involves Wisconsin's school district revenue limit law, see Wis. Stat. § 121.91, and the increases to the revenue limits for school districts that spend money to implement energy efficiency measures or to purchase energy efficiency products, see Wis. Stat. § 121.91(4)(o). Before the 2017-19 budget bill, Wis. Stat. § 121.91(4)(o) (2015-16) provided:

> 1. Except as provided in subd. 1m., if a school board adopts a resolution to do so, the limit otherwise applicable to a school district under sub. (2m) in any school year is increased by the amount spent by the school district in that school year on a project to implement energy efficiency measures or to purchase energy efficiency products, including the payment of debt service on a bond or note issued, or a state trust fund loan obtained, to finance the project, if the project results in the avoidance of, or reduction in, energy costs or operational costs, the project is governed by a performance contract entered into under s. 66.0133, and the bond or note issued or state trust fund loan obtained to finance the project is issued for a term not exceeding 20 years. If a school board issues a bond or note or obtains a state trust fund loan to finance a project described in this subdivision, a resolution adopted by a school board under this subdivision is valid for each school year in which the school board pays debt service on the bond, note, or state trust fund loan.

> 1m. If a school district issues a bond or note or obtains a state trust fund loan to finance a project described in subd. 1., the amount of debt service included in the amount spent by the school district under subd. 1. is the amount paid in the calendar year that begins on January 1 of the school year in which the school district's revenue limit is increased under this paragraph.

> 2. Any additional revenue received by a school district under this paragraph shall not be included in

20

the base for determining the school district's limit under sub. (2m) for the following school year.

3. If a school district issues a bond or note or obtains a state trust fund loan to finance a project described in subd. 1. and the school district's utility costs are measurably reduced as a result of the project, the school board shall use the savings to retire the bond, note, or state trust fund loan.

This law had been in effect since 2009. Section 1641m of the 2017-19 budget bill added subdivision 4 to this statute, which placed a one-year moratorium on the energy efficiency increase to the revenue limits, prohibiting the increase for the 2018 calendar year. Section 1641m provided: "Unless the resolution is adopted before January 1, 2018, subd. 1. applies only to a resolution adopted after December 31, 2018."

¶58 Governor Walker deleted the "1" in "31" and the "2" in "2018" as well as the comma and space between them so the moratorium would not lift until December 3018: "Unless the resolution is adopted before January 1, 2018, subd. 1. applies only to a resolution adopted after December 3~~1, 2~~018." The legislature passed a one-year moratorium on the Energy Efficiency Revenue Limit Adjustment, and Governor Walker's veto changed one year to 1,000 years. The side-by-side chart below shows what the legislature approved compared to what the governor wrote in its place:

21

| Legislative Language | Governor's Final Language |
|---|---|
| 121.91 (4) (o) 4. Unless the resolution is adopted before January 1, 2018, subd. 1. applies only to a resolution adopted after **December 31, 2018.** | 121.91 (4) (o) 4. Unless the resolution is adopted before January 1, 2018, subd. 1. applies only to a resolution adopted after **December 3018.** |

¶59 The governor did not actually "approve" or "reject" any idea passed by the legislature, either in whole or in part, when presented with Section 1641m of the 2017-19 budget bill. Instead, the governor amended a sentence by striking two digits, a comma, and a space to drastically change what the legislature wrote—effectively vetoing the entirety of Wis. Stat. § 121.91(4)(o)1 (which had been law since 2009). Nothing in the Wisconsin Constitution authorizes the governor to amend or create law, and nothing in the Wisconsin Constitution authorizes the governor to unilaterally repeal laws (via his veto power or otherwise). Despite this court's jurisprudence repeatedly inventing veto powers not conferred under the constitution, the court has never empowered the governor to change the effective date of a bill, much less an existing law. See State ex rel. Wis. Senate v. Thompson, 144 Wis. 2d 429, 434, 424 N.W.2d 385 (1988) (allowing the so-called "digit" veto, which permits a governor to "veto" an appropriation amount by reducing it); Citizens Utility Bd. v. Klauser, 194 Wis. 2d 484, 534 N.W.2d 608 (1995) (allowing a governor to write in a different

appropriation amount, provided it is an amount lower than the amount proposed by the legislature).

¶60 The governor's "veto" cannot withstand constitutional scrutiny. The 2017-19 budget bill imposed a one-year moratorium on the Energy Efficiency Revenue Limit Adjustment available to Wisconsin school districts under previously enacted law. By excising individual digits within the date in the bill (along with a comma and a space), the governor imposed a 1,000-year moratorium on the Adjustment. In doing so, he effectively repealed the law, an action the people never approved as an executive power under the constitution but instead reserved solely for the legislature.[9] The governor changed the one-year moratorium approved by both houses of the legislature to 1,000 years, creating a law the legislature never considered, approved, or presented. In doing so, the governor effectively nullified a law that had been on the books for years, singlehandedly eliminating the Energy Efficiency Revenue Limit Adjustment. This veto encroached on the exclusive province of

---

[9] "The constitutional authority to repeal statute law resides exclusively with legislatures." 1A Norman Singer Sutherland Statutory Construction § 32:3 (7th ed. Oct. 2019) ("Power to repeal") (quoted sources omitted; emphasis added). See also Wisconsin Legislature v. Palm, 2020 WI 42, ¶¶91-92, 391 Wis. 2d 497, 942 N.W.2d 900 (Kelly, J., concurring) ("Powers constitutionally vested in the legislature include the powers: 'to declare whether or not there shall be a law; to determine the general purpose or policy to be achieved by the law; [and] to fix the limits within which the law shall operate.' See, e.g., Schmidt v. Dep't of Res. Dev., 39 Wis. 2d 46, 59, 158 N.W.2d 306 (1968) (quoting State ex rel. Wis. Inspection Bureau v. Whitman, 196 Wis. 472, 505, 220 N.W. 929 (1928)). Koschkee v. Taylor, 2019 WI 76, ¶11, 387 Wis. 2d 552, 929 N.W.2d 600 (alteration in original).").

23

the legislature, thereby violating the separation of powers reflected in the constitution, and this court should have so declared in order to confine current and future governors to the exercise of executive power as delineated in the text of the constitution.

### B. The Second Veto

¶61 The second veto involves the Private Label Credit Card Bad Debt Deduction. Wisconsin law allows retailers who issue credit cards to customers to claim a refund of state sales taxes the retailers paid if the retailers are unable to collect payments from customers who charged purchases on the credit cards issued by the retailers, but then failed to pay the credit card bills. Because retailers began partnering with third-party lenders using payment processors such as Visa or Mastercard, instead of using retailer-brand credit cards, the legislature passed a law in 2013 Wisconsin Act 229, amending the definition of "bad debt" in Wis. Stat. § 77.585 to include "dual purpose credit debts and private label credit debts." See § 77.585 (2013-14). This allowed the retailer to take a tax deduction on bad debts arising from credit cards issued by third-party lenders.

¶62 Governor Walker could have vetoed this bad debt bill when the legislature presented it to him in 2013. He did not. He instead signed the bill into law, which was scheduled to take effect on July 1, 2015. The legislature decided to delay the effective date until July 1, 2017, amending § 77.585's effective date in the 2015-17 budget bill. In the 2017-19 budget bill,

24

the legislature decided to delay the effective date for an additional year. The legislature approved July 1, 2018 as the effective date for the bad debt deduction law, and included the following language in Section 2265 of the 2017-19 budget bill:

> Section 6(1) This act takes effect on July 1, ~~2017~~ 2018, and first applies to bad debts resulting from sales completed beginning on July 1, ~~2017~~ 2018.

The governor rejected the legislature's deletion of the "20" in "~~2017~~"; approved the deletion of the "1" in "~~2017~~"; rejected the legislature's deletion of the "7" in "~~2017~~"; deleted the "201" in "2018"; and deleted the space between the "2017" and "2018" to create a new effective date of "July 1, 2078." A side-by-side chart shows the legislative language compared to the governor's amended language:

| Legislative Language | Governor's Final Language |
|---|---|
| [2013 Wisconsin Act 229] Section 6 (1) This act takes effect on **July 1, ~~2017~~ 2018** and first applies to bad debts resulting from sales completed beginning on **July 1, ~~2017~~ 2018**. | [2013 Wisconsin Act 229] Section 6 (1) This act takes effect on **July 1, 2078** and first applies to bad debts resulting from sales completed beginning on **July 1, 2078**. |

Like the other veto, the governor never approved anything passed by the legislature, in whole or in part. Instead, he amended the legislature's language by rejecting the deletion of six digits, striking six digits, deleting two spaces, and merging what was left into a date 60 years in the future. The

25

legislature never presented a 60-years-later effective date to the governor and the legislature never voted on or approved a 60-year delay.

¶63 Similar to the other veto, the governor's actions effectively repealed a law previously enacted and signed by the governor. Unlike the 1,000 year delay created by the other veto, the people will have to wait only 60 years for the law enacted by the legislature to take effect. As a result, the current statutes contain (and every subsequently printed statute book for the next 60 years will contain) both the current Wis. Stat. § 77.585 as well as the law enacted by the legislature (albeit with an effective date unilaterally chosen by the governor), which appears in a "Note" following the current statute offering the following explanation: "Sub. (1) is renumbered, in part, amended, in part, and created, in part, eff. 7-1-2078 . . . to read:"; the text of the enacted statute follows, as amended by the governor.[10]

_____

[10] On July 2, 2078, Wis. Stat. § 77.585 will provide:

(1) (a) In this subsection:

1. "Bad debt" means the portion of the sales price or purchase price that the seller has previously reported as taxable under this subchapter, and for which the seller has paid the tax, and that the seller or lender may claim as a deduction under section 166 of the Internal Revenue Code. "Bad debt" does not include financing charges or interest, sales or use taxes imposed on the sales price or purchase price, uncollectible amounts on tangible personal property or items, property, or goods under s. 77.52 (1) (b), (c), or (d) that remain in the seller's possession until the full sales price or purchase price is paid, expenses incurred in attempting to collect any debt, debts sold or assigned to 3rd parties for collection,

not including dual purpose credit debts and private label credit debts, and repossessed property or items.

2. "Dual purpose credit card" means a credit card that may be used as a private label credit card or to make purchases from persons other than the seller whose name or logo appears on the card or the seller's affiliates or franchisees, if the credit card issuer is able to determine the sales receipts of the seller and the seller's affiliates or franchisees apart from any sales receipts of unrelated persons.

3. "Dual purpose credit debt" means accounts and receivables that result from credit sale transactions using a dual purpose credit card, but only to the extent the account or receivable balance resulted from purchases made from the seller whose name or logo appears on the card.

4. a. "Lender" means any person who owns a private label credit debt, an interest in a private label credit debt, a dual purpose credit debt, or an interest in a dual purpose credit debt, if the person purchased the debt or interest directly from a seller who remitted the tax imposed under this subchapter or from a third party or if the person originated the debt or interest pursuant to the person's contract with the seller who remitted the tax imposed under this subchapter or with a third party.

b. "Lender" includes any person who is a member of the same affiliated group, as defined under section 1504 of the Internal Revenue Code, as a lender or is an assignee or other transferee of a lender.

5. "Private label credit card" means any charge card or credit card that identifies a seller's name or logo on the card and that may be used only for purchases from that seller or from any of the seller's affiliates or franchisees.

6. "Private label credit debt" means accounts and receivables that result from credit sale transactions using a private label credit card, but only to the extent the account or receivable balance resulted from purchases made from the seller whose name or logo appears on the card.

27

(b) A seller may claim as a deduction on a return under s. 77.58 the amount of any bad debt that the seller or lender writes off as uncollectible in the seller's or lender's books and records and that is eligible to be deducted as a bad debt for federal income tax purposes, regardless of whether the seller or lender is required to file a federal income tax return. A seller who claims a deduction under this paragraph shall claim the deduction on the return under s. 77.58 that is submitted for the period in which the seller or lender writes off the amount of the deduction as uncollectible in the seller's or lender's books and records and in which such amount is eligible to be deducted as bad debt for federal income tax purposes. If the seller or lender subsequently collects in whole or in part any bad debt for which a deduction is claimed under this paragraph, the seller shall include the amount collected in the return filed for the period in which the amount is collected and shall pay the tax with the return.

(bm) For purposes of par. (b), a seller may compute the seller's bad debt deduction using an estimate, if the department approves the method for computing the estimate. The department may audit the seller's books and records to review the estimate and adjust the estimate as necessary to reflect the actual allowable bad debt amount.

(c) For purposes of computing a bad debt deduction or reporting a payment received on a previously claimed bad debt, any payment made on a debt or on an account is applied first to the price of the tangible personal property, or items, property, or goods under s. 77.52 (1) (b), (c), or (d), or service sold, and the proportionate share of the sales tax on that property, or items, property, or goods under s. 77.52 (1) (b), (c), or (d), or service, and then to interest, service charges, and other charges related to the sale. If payment is received on an account for which the balance reflects multiple sales transactions, the payment is applied to the sales transactions in the same order in which the sales transactions occurred.

(d) A seller may obtain a refund of the tax reported for any bad debt amount deducted under par. (b) that exceeds the amount of the seller's taxable sales as provided under s. 77.59 (4), except that the period

¶64 The governor used his veto power to modify the effective date of a law passed years before the 2017-19 budget bill and set to go into effect on July 1, 2018. The governor did not veto a complete idea voted on and approved by the legislature and presented to the governor as a <u>bill</u>. His veto prevented <u>existing law</u> from taking effect for another six decades. Like the other "veto," this veto also invaded the province of the legislature by amending——to the point of nullifying——an enacted law, previously passed by the legislature and approved by the governor.

¶65 The people of Wisconsin never gave the governor this power. It is the responsibility of this court to guard against

for making a claim as determined under s. 77.59 (4) begins on the date on which the return on which the bad debt could be claimed would have been required to be submitted to the department under s. 77.58.

(e) If a seller is using a certified service provider, the certified service provider may claim a bad debt deduction under this subsection on the seller's behalf if the seller has not claimed and will not claim the same deduction. A certified service provider who receives a bad debt deduction under this subsection shall credit that deduction to the seller and a certified service provider who receives a refund under this subsection shall submit that refund to the seller.

(f) If a bad debt relates to the retail sales of tangible personal property, or items, property, or goods under s. 77.52 (1) (b), (c), or (d), or taxable services that were sourced to this state and to one or more other states, as determined under s. 77.522, the total amount of such bad debt shall be apportioned among the states to which the underlying sales were sourced in a manner prescribed by the department to arrive at the amount of the deduction under par. (b).

the encroachment of the executive branch upon the people's representatives in the legislative branch. "The significance of preserving clear boundaries between the branches has been understood since the founding of our nation[.]" Gabler, 376 Wis. 2d 147, ¶60. It is the duty of this court to be "ever vigilant in averting the accumulation of power by one body——a grave threat to liberty[.]" Id. When this court hears a case involving such encroachment by the governor via the exercise of veto power not authorized by the constitution, it is the duty of this court to check it.

¶66 In exercising each of these vetoes, the governor violated the separation of powers by assuming the authority to legislate, a power the constitution confers on the legislature alone. Under the Wisconsin Constitution, the governor may approve or reject a bill presented by the legislature and may approve "in whole or in part" an appropriation bill. The vetoed part as well as the approved part must each represent a complete idea on which the legislature voted. The veto cannot be used to change what the legislature presented; the veto cannot be used to create new law the legislature never approved; and the veto cannot be used to unilaterally erase laws enacted in previous years.

¶67 These vetoes were unconstitutional, and this court should have so declared. Instead, the majority leaves the petitioners, the governor, the legislature, and the people of Wisconsin without an answer to this important constitutional question the court told them we would resolve.

30

VI. CONCLUSION

¶68 The governor's vetoes challenged by WSBU transgressed the boundaries of executive power in unilaterally repealing existing laws by extending their effective dates 1,000 years and 60 years, respectively. Rather than approving these appropriation bills "in whole or in part," as permitted under the Wisconsin Constitution, the governor deleted digits in dates, a punctuation mark, and spaces in order to create new effective dates set far in the future. When a governor replaces a law's legislatively-written effective date with his preferred effective date——one never approved or presented by the legislature——he assumes a power to create law, which only the legislature may constitutionally exercise. Both vetoes are patently unconstitutional because nothing in the constitution authorizes a governor to unilaterally repeal existing law or amend a law's effective date, actions reserved to the legislature alone.

¶69 The majority refuses to consider the merits despite having granted this original action on the sole and significant issue of the constitutional scope of the governor's veto power as exercised in the two instances presented for our review. Instead, the majority takes the unprecedented and completely discretionary step of declining to declare rights in an original action presenting an issue of first impression regarding the constitutionality of a governor's vetoes, electing to deny relief under the doctrine of laches. In doing so, the majority shirks its duty to preserve the constitutional balance of power

31

between the political branches, abandoning the judiciary's pivotal role in protecting the bedrock of our structure of government.  I respectfully dissent.

¶70  I am authorized to state that Justice DANIEL KELLY joins this dissent.